*Roderick Griffin v. State of Maryland*, No. 1645 of the September 2022 Term, Opinion by Moylan, J.

**HEADNOTE:**

THE <u>HICKS</u> RULE – HOW TO COUNT TO 180? POSSIBLY DISRUPTIVE EFFECT OF A NOL PROS AND REINDICTMENT – THE NOL PROS GENERALLY – THE <u>CURLEY</u> OPINION – THE <u>CURLEY</u> EXCEPTION[S] – THE EXCEPTION, LOUD AND CLEAR – THE DISJUNCTIVE NATURE OF THE <u>CURLEY</u> EXCEPTION[S] – THE NECESSARY EFFECT OF CIRCUMVENTING <u>HICKS</u> – THE WINDOW OF OPPORTUNITY – THE <u>CURLEY</u> EXCEPTION CASES: A DISTINCT SUB-GENRE OF THE <u>HICKS</u> RULE – 1. <u>CURLEY</u> EXCEPTION APPLIED: <u>HICKS</u> RULE WAS VIOLATED – A. <u>CURLEY V. STATE</u> (1984) – B. <u>ROSS V. STATE</u> (1997): CLOSING THE WINDOW OF OPPORTUNITY – C. <u>STATE V. PRICE</u> (2003) – D. <u>ALTHER V. STATE</u> (2004) – E. <u>WHEELER V. STATE</u> (2005) – 2. <u>CURLEY</u> EXCEPTION DID NOT APPLY: <u>HICKS</u> RULE THEREFORE WAS NOT VIOLATED – A. <u>STATE V. GLENN</u> (1984) – B. <u>STATE V. BROWN</u> (1996) – C. <u>BAKER V. STATE</u> (2000) – D. <u>STATE V. AKOPIAN</u> (2004) – E. <u>STATE V. HUNTLEY</u> (2009) – REQUIRED READING – A <u>CURLEY</u> EXCEPTION SYNOPSIS – THE PRESENT CASE – THE <u>CURLEY</u> EXCEPTION TO THE NORM – A. THE PURPOSE PRONG – B. THE NECESSARY EFFECT PRONG – APPELLATE DEFERENCE

ENTR'ACTE - A SECOND FIDDLE CONTENTION: "THROUGH A GLASS DARKLY" – <u>BARKER V. WINGO</u> (1972) – "LENGTH OF DELAY" AS A

**TRIGGER MECHANISM VERSUS "LENGTH OF DELAY" AS ONE FACTOR TO BE WEIGHED – BEWARE THE TERM: "PRESUMPTIVELY PREJUDICIAL" – WHICH "LENGTH OF DELAY" ARE WE TALKING ABOUT? – OUT OF ONE CONTEXT AND INTO ANOTHER – REASON FOR DELAY – ASSERTION OF A REQUEST FOR SPEEDY TRIAL – PREJUDICE TO THE DEFENDANT – THE <u>BARKER V. WINGO</u> FOUR-FACTORED ANALYSIS – A GAPING DIFFERENCE – A LINGUISTIC TROJAN HORSE – A NARROW DEFINITION – THE LINGUISTIC SLEIGHT-OF-HAND INHERENT IN THE TERM "PRESUMPTIVELY PREJUDICIAL" – THE PROBLEM – THE SOLUTION**

Circuit Court for Baltimore City
Case No. 121313001

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1645

September Term, 2022

_____

RODERICK GRIFFIN

v.

STATE OF MARYLAND

_____

Berger,
Beachley,
Moylan, Charles E., Jr.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: June 12, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The initial theme of this opinion will be the effect that the filing of a Nol Pros by the State to criminal charges followed by a reindictment on those same charges may have on the right of a Maryland defendant to a statutory speedy trial, a right known familiarly as the Hicks Rule. One further task will then be to isolate within that body of law a sub-genre of the Hicks Rule now familiarly known as the Curley exception.

There is also a second theme. It concerns the widespread misuse of the elusive "length of delay" factor in much constitutional speedy trial analysis. It especially disdains the deceptive misuse of the potentially toxic phrase "**presumptively prejudicial**" to describe a "length of delay." Quintessentially, this second contention is a second and separate appeal.

The appellant, Roderick Griffin, was convicted in the Circuit Court for Baltimore City by a jury, presided over by Judge Yvette M. Bryant, of second-degree murder and false imprisonment. On this appeal he raises two contentions. They are:

> **1. That Judge Erik S. Atas erroneously denied his pretrial Motion to Dismiss the case because the State impermissibly circumvented Maryland Rule of Criminal Procedure 4-271 and Maryland Code, Criminal Procedure Article, Sect. 6-103; and**

For reasons that will be explained more fully infra, we pose the appellant's second contention in the precise words (including capitalization) used by the appellant in his appellate brief:

> **2. The Circuit Court Erred in Denying the Motion to Dismiss Because Appellant's Constitutional Speedy Trial Rights Were Violated.**

## The Hicks Rule

Since the milestone opinion of Chief Judge Robert C. Murphy for the Supreme Court of Maryland in State v. Hicks, 285 Md. 310, 403 A.2d 356 in 1979, the very name Hicks has assumed an eponymous status as the widely recognized mantle for Maryland's statutory law and accompanying Rule of Procedure described by that opinion, as well as for a critically dispositive date identified in that opinion. As Judge McDonald later summed up the linguistic phenomenon in Tunnell v. State, 466 Md. 565, 569, 223 A.3d 122 (2020):

> Under a State statute and related court rule, collectively known as the "Hicks rule," a criminal trial in a circuit court must commence within 180 days of the first appearance of the defendant or defense counsel in that court, a deadline known as the "Hicks date."

(Emphasis supplied.) *See also* Jackson v. State, 485 Md. 1, 9, 300 A.3d 169 (2023).

It was Chief Judge Murphy's opinion that established the linguistic as well as legal dominance of Hicks over this entire body of law. Prior to Hicks, it had been the position of the Maryland appellate courts that the rules regulating the prompt disposition of criminal cases were only "directory and not mandatory." Judge Murphy described, 285 Md. at 316, that earlier laxity:

> In Young v. State, 15 Md. App. 707, 292 A.2d 137 (1972), the Court of Special Appeals held that the provisions of s 591 were intended by the legislature to be directory and not mandatory because it had not explicitly provided the extreme sanction of dismissal of an indictment for administrative noncompliance. We adopted that view by summarily approving the opinion of the Court of Special Appeals. See Young v. State, 266 Md. 438, 294 A.2d 467 (1972).

(Emphasis supplied.)

The Supreme Court in the Hicks opinion, 285 Md. at 318, however, then made the conscious and deliberate decision to make that Rule of Procedure requiring the prompt disposition of criminal cases mandatory rather than merely directory:

> By our adoption of Rule 746 in 1977, we intended to supersede the provisions of s 591(a) and put teeth into a new regulation governing the assignment of criminal cases for trial…We deemed it essential, as is evident from the language of Rule 746, to place mandatory controls over the scheduling of criminal cases for trial, and over their postponement, to assure that criminal charges would be promptly heard and resolved.

(Emphasis supplied.)

The Hicks Court, id., left no doubt as to the mandatory nature of what would thereafter come to be known as the Hicks Rule:

> The provisions of Rule 746 are of mandatory application, binding upon the prosecution and defense alike; they are not mere guides or bench marks to be observed, if convenient. Accordingly, Judge Pollitt was correct in holding that Rule 746 is mandatory and that dismissal of the criminal charges is the appropriate sanction where the State fails to bring the case to trial within the 120-day period prescribed by the rule and where "extraordinary cause" justifying a trial postponement has not been established.

(Emphasis supplied.) The Rule would have teeth.

The Hicks Rule is now mandated by both a legislative provision and an implementing Rule of Procedure. Maryland Code, Criminal Procedure Article Sect. 6-103 statutorily provides, in pertinent part:

> (a)(1) The date for trial of a criminal matter in the circuit court shall be set within 30 days after the earlier of:
>
> > (i) the appearance of counsel; or
> >
> > (ii) the first appearance of the defendant before the circuit court, as provided in the Maryland Rules.

3

(2) <u>The trial date may not be later than 180 days after the earlier of those events</u>.

(Emphasis supplied.)

That legislative mandate is in turn implemented by Maryland Rule of Criminal Procedure 4-271, which administratively provides, in pertinent part:

(a) Trial Date in Circuit Court

(1) <u>The date for trial in the circuit court</u> shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4-213, and <u>shall not be later than 180 days after the earlier of those events</u>.

(Emphasis supplied.)

## How To Count To 180?
## Possibly Disruptive Effect Of A Nol Pros And Reindictment

In terms of its dominant command, this <u>Hicks</u> Rule would seem simple enough to calculate and to apply. Did the criminal trial ultimately begin, as is required, within 180 days of the relatively easily ascertainable starting date for its 180-day count? Or did it not? Counting to 180 would seem to be elementary. What happens, however, if that count is interrupted in mid-count but subsequently starts up again? What happens if within that 180-day period, the State Nol Prosses the original criminal case against the defendant but subsequently re-files identical charges? Will the interrupted count resume from where it had been stopped or will a totally new count begin?

The initial count, of course, will stop. The case that was Nol Prossed will be thereby presumptively terminated. If the defendant is never recharged, there can be, by definition, no problem. The defendant will never have been tried and the <u>Hicks</u> Rule forbidding an

4

untimely <u>trial</u>, therefore, could never have been violated. A <u>Hicks</u> violation contemplates a trial, albeit a late one. What if, however, following the Nol Pros of the original criminal charges, the defendant were recharged, by reindictment or otherwise, with identical or similar charges? Should we pick up and continue the original count from the point where it had been interrupted? Or should we begin a totally new count following the filing of the new charges, confining our concern to the new charges alone? The problem is that, depending upon the circumstances, we might do either. What then are those controlling circumstances? And why?

## The Nol Pros Generally

For a definitive analysis of a <u>Nol</u> <u>Pros</u> in Maryland, the Alpha and Omega is the masterful three-opinion survey of the <u>Nol</u> <u>Pros</u> by Judge John Eldridge for the Maryland Supreme Court in the early 1980's. Those three opinions are <u>Ward v. State</u>, 290 Md. 76, 427 A.2d 1068 (1981); <u>State v. Moulden</u>, 292 Md. 666, 441 A.2d 699 (1982); and <u>Curley v. State</u>, 299 Md. 449, 474 A.2d 502 (1984). To begin at the beginning, the <u>Ward</u> opinion reached back, 290 Md. at 82-83:

> Apparently <u>the first reported case</u> discussing the entry of a nolle prosequi in a criminal prosecution <u>was Stretton and Taylors Case</u>, 1 Leon. 119, 74 Eng. Rep. 111 (K.B. 1588), where the Attorney General entered a <u>"non vult prosequi"</u> for purpose of preventing a private prosecution. Since that time, <u>the nolle prosequi has been a means whereby the government exercises control over pending criminal cases</u>.

(Emphasis supplied.)

The <u>Ward</u> opinion, 290 Md. 83, quoted with approval 2 Noel Bishop, <u>New Criminal Procedure</u> (2d ed. 1913), Sect. 1387, p. 1194:

5

> [A] Nolle Prosequi in criminal practice (for it pertains also to civil), <u>is a declaration</u> of record <u>from the legal representative of the government, that he will no further prosecute the particular indictment</u> or some designated part thereof.

(Emphasis supplied.) The <u>Ward</u> opinion, 290 Md. at 83, went on:

> <u>The entry of a nolle prosequi is generally within the sole discretion of the prosecuting attorney,</u> free from judicial control and not dependent upon the defendant's consent.

(Emphasis supplied.) *See also* <u>Barrett v. State</u>, 155 Md. 636, 638, 142 A. 96 (1928) ("[T]he case [is] terminated…and there can be no further prosecution under that indictment.").

As <u>Moulden</u>, 292 Md. at 673, then further pointed out, a charge or part of a charge, once <u>Nol</u> <u>Prossed</u>, leaves nothing to be finally disposed of. The terminated charge no longer has any operative potency:

> <u>The nol pros of a charging document</u> or of a count <u>is "a final disposition" of the charging document</u> or count; <u>there can be no further prosecution under the nol prossed charging document</u> or count; <u>the matter is "terminated"</u> at that time; and <u>the accused may be proceeded against for the same offense only under a new or different charging document</u> or count. [W]here a nolle prosequi is entered before jeopardy attaches, the state is…precluded from further prosecution under the indictment or count so dismissed. <u>The nol pros of one count in a multi-count indictment leaves the prosecution just as though no such count had ever been inserted in the indictment.</u>

Id. (Internal citations omitted.) (Emphasis supplied.) *See also* <u>State v. Ferguson</u>, 218 Md. App. 670, 680, 98 A.3d 433 (2014); <u>Huebner v. District Court of Maryland</u>, 62 Md. App. 462, 470, 490 A.2d 266 (1985), <u>aff'd</u>, 305 Md. 601, 505 A.2d 1331 (1986). As this Court described the independent character of the fresh charges in <u>Baker v. State</u>, 130 Md. App. 281, 288, 745 A.2d 1142 (2000):

> <u>This then is the norm</u> – the accepted way of counting to 180. When earlier charges are *nol prossed* and new charges are subsequently filed, <u>the new</u>

charges have a life of their own. <u>A new and independent 180-day count begins with respect to them</u>.

(Emphasis supplied.)

This trilogy of cases is the necessary point of departure for any comprehensive understanding of the issue now before us. It was the third entry in that three-opinion survey, <u>Curley v. State</u>, that raised for the first time the possible impact of a collision between the otherwise free-wheeling prerogative of the State to wield a <u>Nol Pros</u>, on the one hand, with the constraints placed on the <u>Nol Pros</u> by the <u>Hicks</u> Rule, on the other hand. We are dealing with a very basic procedural principle, the State's authority to Nol Pros a case, and then with a critically important exception imposed on that basic principle, the limitations imposed on that authority by the <u>Hicks</u> Rule. As the <u>Curley</u> opinion announced, 299 Md. at 452, at its very outset:

> The question presented by the instant case concerns the application of §591 [now §6-103] and Rule 746 [now Rule 4-271] where <u>the prosecuting attorney files a nol pros prior to the expiration of the 180-day period and thereafter causes the same charge or charges to be refiled against the defendant</u>.

(Emphasis supplied.)

### The **Curley** Opinion

The <u>Curley</u> opinion, 299 Md. at 455, first undertook a survey of the national caselaw:

> <u>The broad issue presented in this case is not addressed by either the language of § 591 and Rule 746 or by any prior opinions of this Court</u>. An examination of cases in other jurisdictions…reveals no uniformity in approach…<u>The approaches taken in other jurisdictions can be divided into three broad</u>, if not always clearly bounded, <u>categories</u>.

(Emphasis supplied.) How shall a Nol Pros followed by a reindictment be handled?

7

After examining in detail the first two approaches[1], <u>Curley</u> pointed out, 299 Md. at 459, that it is the third approach that is most in harmony with Maryland law:

> We believe that <u>the approach taken by cases in the third category is preferable. Ordinarily, treating the 180-day period as beginning to run anew after the refiling of the charges is in accord with Maryland law</u>.
>
> <u>The courts which consider the time during the initial prosecution which has been nol prossed</u>, whether or not the time between prosecutions is regarded as tolled, <u>are to some extent treating the second prosecution as a continuation of the first prosecution. This, however, is inconsistent with the Maryland law regarding a nol pros</u>. Under our decisions, <u>when an indictment or other charging document is nol prossed, ordinarily the case is terminated</u>.

(Emphasis supplied.)

---

[1]     The first category of cases does not accord any effect to a Nol Pros on the running of the statutory period for the trial of the case. The statutory count, once begun, continued as if the Nol Pros had never occurred. <u>Curley</u> commented, 299 Md. at 456:

> The rationale for this approach appears to be that <u>the state should not be permitted to avoid the effect of the running of the speedy trial period through the entry of a nolle prosequi</u>. These cases take the view that <u>where the identical charge is refiled, it must be regarded as if there had been no dismissal of the first complaint</u>, or as if the second had been filed on the date of the first.

(Emphasis supplied.)

The second category of cases engages heavily in an analysis of the phenomenon of tolling. It tolls the running of the single statutory time period "for the period during which no indictment is outstanding." <u>Curley </u>explained that approach, 299 Md. at 458:

> [T]he cases taking the tolling approach hold that the period of time between the two indictments should not be counted because, when a charge is nolle prossed…there is no charge pending against the defendant, and that <u>the speedy trial statute runs only when a charge is pending against a defendant</u>.

(Emphasis supplied.)

Cases in this third category take the position that when criminal charges are Nol Prossed and later refiled, the time period for commencing trial ordinarily begins to run anew after the refiling. That is the norm. Those holdings are based upon the inherent notion and basic effect of a Nol Pros. The original charge that is nol prossed is over and done with and no danger from it enters into the calculation. As Judge Eldridge observed, 299 Md. at 460:

> Normally the effect of a nol pros is as if the charge had never been brought in the first place. In light of this, the only existing prosecution or case is that begun by the new charging document. It is the trial under that prosecution which must be timely commenced.

(Emphasis supplied.)

Ultimately, however, the originally uninhibited prerogative of the State to Nol Pros a criminal charge and the equally uninhibited prerogative to refile those charges had to be reconciled with the growing imperative that criminal trials be timely and promptly disposed of. Without some constraints being imposed upon the State's prerogative of nol prossing and then refiling charges, the efforts to insure speedy trials could be rendered meaningless. The Curley opinion, 299 Md. at 461, sounded the alarm:

> If, whenever the state desired a trial postponement beyond 180 days, it could nol pros the case, refile the same charges, and thereby cause the time period to start running anew, the requirements of § 591 and Rule 746 would largely be rendered meaningless. By such method the state could regularly escape the necessity, mandated by the statute and rule, of showing good cause for a postponement and obtaining an order of the administrative judge.

(Emphasis supplied.)

## The Curley Exception[s]

Generally speaking, the State's prerogative to Nol Pros and to recharge remains uninhibited. That continues to be the norm. With the Nol Pros of the original charge, all time constraints on the timeliness of the trial of those original charges became null and void. The original charges simply will not be tried. If criminal charges are refiled, however, that constitutes a new and different case with a new beginning. The measure of its life span will be self-contained. Whatever may have happened to the earlier case will have nothing to do with what happens to the new case. They are independent of each other.

A dispositive exception to that generally recognized rule will apply, however, if and when **the purpose or the necessary effect** of the Nol Pros and refiling would be to circumvent the statute and rule imposing a time limit on the original trial. That exception is of critical importance. The otherwise unfettered right to Nol Pros and to recharge is overridden by this critically important exception. <u>Curley</u>'s core provision, 299 Md. at 459, is:

> generally [to] recognize <u>an exception where the prosecution's action is intended or clearly operates to circumvent the statute or rule prescribing a time limit for trial</u>. As the cases put it, <u>the prosecution must be acting in "good faith" or so as to not "evade" or "circumvent" the requirements of the statute or rule setting a deadline for trial</u>.

(Emphasis supplied.) To begin a new count is the norm. To resume the old count is the exception to the norm.

## The Exception, Loud And Clear

The <u>Curley</u> exception could not have been stated more clearly:

> We hold, therefore, that <u>when a circuit court criminal case is nol prossed, and the state later has the same charges refiled</u>, the 180-day period for trial prescribed by § 591 and Rule 746 <u>ordinarily begins to run with the</u>

> arraignment or first appearance of counsel under the second prosecution. If, however, it is shown that the nol pros had **the purpose or the effect** of circumventing the requirements of § 591 and Rule 746, the 180-day period will commence to run with the arraignment or first appearance of counsel under the first prosecution.

299 Md. at 462. (Emphasis supplied.) "The purpose **OR** the effect."

## The Disjunctive Nature Of The <u>Curley</u> Exception[s]

In the <u>Curley</u> case itself, the 180-day clock first began to tick on September 22, 1980 with Curley's counsel's entering of his first appearance in the Circuit Court. Consequently, the <u>Hicks</u> final destination date was March 23, 1981. With an earlier trial date having been uneventfully postponed and with no new trial date having been set, the State on the <u>Hicks</u> date itself Nol Prossed all charges. Until that point, everything had been uneventful and non-contentious. It was not until June 26, 1981 that the State ultimately filed a second criminal information, charging Curley with exactly the same offense. The trial commenced on December 15, 1981, 449 days after the first 180-day count had begun to run and 160 days after the formal appearance of counsel under the second information. Curley filed no less than three motions to dismiss the new charges, alleging a violation of both his constitutional right to a speedy trial and a violation of the <u>Hicks</u> rule. All three motions were denied.

In overruling the Circuit Court's decision to deny the defense motion and in holding that the <u>Hicks</u> Rule had, indeed, been violated and that all charges against Curley must therefore be dismissed, the Maryland Supreme Court highlighted the double-barreled nature of its disjunctive exception. Following the entry of a Nol Pros and the subsequent filing of new charges, the normal procedure of beginning a totally fresh 180-day count will

11

not prevail when 1) the State's "purpose" in entering the Nol Pros is found to have been to circumvent the <u>Hicks</u> Rule **OR** 2) the "necessary effect" of the Nol Pros will have been or will be to violate the <u>Hicks</u> Rule. In this case, it was this second prong of the disjunctive <u>Curley</u> exception that was established. That, of course, is all that was required to result in a violation of the <u>Hicks</u> Rule.

As of the date that the Nol Pros was filed, there had never been any effort by the State to have the case postponed "for good cause" beyond the <u>Hicks</u> deadline. In a contemporaneous letter to defense counsel, the State had explained that "this disposition was made based on the combined factors of the apparent inadmissibility of the blood alcohol content test as performed in this case and upon the request made of the State by the family of the victim." There was never a finding nor even an argument that the State's purpose had been otherwise. There was no remote showing that the State's purpose of entering the Nol Pros had been to circumvent the <u>Hicks</u> Rule. The first part of the <u>Curley</u> exception was in no way involved. The trial court so found.

Such a showing of an improper purpose is not, of course, necessary for the State's purpose for entering a Nol Pros is but one prong of the two-pronged <u>Curley</u> exception. Even if the purpose of the Nol Pros had not been to circumvent the <u>Hicks</u> Rule, the necessary effect of the Nol Pros may nonetheless have been to circumvent the <u>Hicks</u> Rule. The concluding sentence of the <u>Curley</u> opinion, 299 Md. at 462-63, made that disjunctive nature of the exception pellucidly clear:

> <u>Regardless of the prosecuting attorney's motives</u>, <u>the necessary effect of the nol pros was an attempt to evade the dismissal resulting from the failure to try the case within 180 days.</u>

(Emphasis supplied.)

## The Necessary Effect Of Circumventing <u>Hicks</u>

The <u>Curley</u> exception thus covers either (or both) of two possible improprieties: 1) the State's motive for entering the Nol Pros, to wit, its **PURPOSE**; or 2) the necessary consequence of the Nol Pros, to wit, its **EFFECT**. Quite aside from what the State in a given case may have intended when it entered the Nol Pros, the very timing of the Nol Pros may have made a violation of the <u>Hicks</u> Rule inevitable or virtually inevitable. In the <u>Curley</u> case itself, the trial court found that the State's purpose in entering the Nol Pros had not been an improper one. The <u>Hicks</u> deadline, however, had arrived and there was no way that the trial could have been held that day. The Supreme Court held that the Circuit Court's reading of the <u>Curley</u> exception, to wit, its exclusive concern with the Nol Pros's "purpose," had been too limited and had failed to take into account the separate question of the "necessary effect" of the Nol Pros. It held, at 299 Md. at 461:

> The trial court in the present case recognized that <u>the time period</u> set forth in § 591 and Rule 746 <u>should not begin to run anew with the second prosecution where it was shown that the purpose of the nol pros was to evade the requirements of the statute and rule</u>. <u>The exception recognized by the trial court, however, is too limited</u>. <u>Where the state's action necessarily circumvents the statute and rule prescribing a deadline for trial, this should be sufficient to continue the time period running with the initial prosecution</u>.

(Emphasis supplied.)

<u>Curley v. State</u> thus began in 1984 what would become, over the intervening 40 years, a pivotal sub-genre of <u>Hicks</u> Rule law involving Nol Prosses and reindictments, a close examination of their purposes and their necessary effects.

13

**The Window Of Opportunity**

In assessing whether the Nol Pros/reindictment will have the "necessary effect" of violating the <u>Hicks</u> Rule, a major factor will frequently be what we will call the Window of Opportunity. The measurement of a Window of Opportunity begins on the day that the Nol Pros is entered. It extends from that Nol Pros to the <u>Hicks</u> date at the end of the original 180-day countdown on the original charges. When we assess whether, in entering the Nol Pros, the State had the improper "purpose" of circumventing the <u>Hicks</u> Rule, we are dealing with the present tense. The "purpose" is the State's state of mind right now, as of the very moment when the Nol Pros is entered. In assessing the "necessary effect" of the Nol Pros, on the other hand, we are dealing with the future tense. We are, of necessity and at least to some small extent, speculating. We are engaging in an informed speculation as to whether the entry of the Nol Pros **NOW** will have the overwhelming likelihood, as a virtual inevitability, of producing a **FUTURE** circumvention of the <u>Hicks</u> Rule if and when the case fails to make it to the trial table ahead of the <u>Hicks</u> deadline.

A major factor in that assessment will be the Window of Opportunity. Even if we assume that the State is able to enter the Nol Pros of its original charges and then to follow up with a refiling of the charges virtually immediately, in Churchillian terms "within the hour," will there be enough time remaining to get the refiled charges to the trial table before the passing of the <u>Hicks</u> deadline? That "time remaining" is the Window of Opportunity.

**A NOTE OF CAUTION**: The Window of Opportunity is largely, but by no means exclusively, a mathematical measurement. There will be other factors that may influence what can happen and what probably cannot happen within that given time frame. In any

event, if the State enjoys a Window of Opportunity of 80 or 90 days, it is obviously better situated than if it is stuck with a Window of Opportunity of only eight or nine days. Even within a narrow window of opportunity, moreover, the planets may so align that the State may still be able to meet its 180-day deadline. The Window of Opportunity is a significant factor in the "necessary effect" aspect of Curley exception analysis.

## The Curley Exception Cases: A Distinct Sub-Genre Of The Hicks Rule

The Curley exception has been prolific. Counting the Curley case itself, no less than ten appellate opinions now flesh out how the Hicks Rule handles the special problem of "How to count to 180" despite the snares and pitfalls of Nol Prosses and reindictments. Five of those ten cases were triggered by State appeals.

In five of the cases, it was held that at least one prong of the Curley exception had been established, that the original 180-day count would therefore resume at the point when it had been interrupted, that the Hicks Rule would thereby have been violated, and that the case against the defendant must therefore be dismissed. Those five cases were the Curley case itself; Ross v. State, 117 Md. App. 357, 700 A.2d 282 (1997); State v. Price, 152 Md. App. 640, 833 A.2d 614 (2003); Alther v. State, 157 Md. App. 316, 850 A.2d 1211 (2004); and Wheeler v. State, 165 Md. App. 210, 885 A.2d 351 (2005).

In the other five cases, it was held that neither prong of the Curley exception had been established, that the 180-day count could thus begin afresh with the filing of the new case, that the Hicks Rule would thus not be violated, and that the prosecution could continue. Those five cases were State v. Glenn, 299 Md. 464, 474 A.2d 509 (1984); State

15

v. Brown, 341 Md. 609, 672 A.2d 602 (1996); Baker v. State, 130 Md. App. 281, 745 A.2d 1142 (2000); State v. Akopian, 155 Md. App. 123, 841 A.2d 893 (2004); and State v. Huntley, 411 Md. 288, 983 A.2d 160 (2009). This case is now the eleventh to address this exception.

### 1. Curley Exception Applied: Hicks Rule Was Violated

We will look first at the five cases in which at least one of the Curley exceptions was found to apply and in which the Hicks Rule was ultimately found to have been violated. In dealing with a Nol Pros generally in the course of a criminal trial, the statistical norm is that the Hicks Rule is not involved in that particular criminal trial. As Curley v. State informs us, however, there may be an exception to that norm. The Hicks Rule may be involved in that particular criminal trial. Ordinarily, a Nol Pros does not in any way implicate Hicks. A Curley exception, however, establishes that Hicks is at least a relevant factor in the case and that a further examination is called for to determine whether the Hicks Rule has, indeed, been violated.

In looking at the Curley exception cases, it turns out that the State's **PURPOSE** in entering the Nol Pros is less frequently the critical factor in the case than is the necessary **EFFECT** of the Nol Pros on the Hicks requirement.

**A. Curley v. State (1984)**

In the Curley case itself, the "necessary effect" of the Nol Pros on the State's chance of satisfying the Hicks deadline was devastating. The Window of Opportunity was less than one day in Wicomico County. That window consisted at most of several hours (if not,

16

indeed, of several minutes). As the <u>Curley</u> opinion itself characterized the "necessary effect," 299 Md. at 462:

> In the instant case, <u>the nol pros clearly circumvented the requirements of § 591 and Rule 746</u>. <u>When the nol pros was entered</u> on March 23, 1981, which was the final day for trial, <u>it was too late for compliance</u> with §591 and Rule 746. At the time a trial date had not even been assigned. <u>The case could not have been tried on March 23rd</u>, as the defendant, his counsel, and witnesses were not present. There was no reason for them to have been present, as March 23rd was not the assigned trial date. <u>As of the close of business on March 23rd, the case would have had to have been dismissed for violation of § 591 and Rule 746</u>. <u>In reality, the prosecution had already lost this case</u> under § 591 and Rule 746 <u>when the nol pros was filed</u>.

(Emphasis supplied.)

The fact that in entering the Nol Pros, the State in <u>Curley</u> did not have the maleficent "purpose" of circumventing the <u>Hicks</u> Rule did not ameliorate the necessary and maleficent effect that the Nol Pros had in making that circumvention inevitable.

**B. <u>Ross v. State</u> (1997): Closing The Window Of Opportunity**

The primary lesson to be learned from <u>Ross v. State</u> is that the Window of Opportunity is not a numerical absolute. That critical opportunity to avoid a <u>Hicks</u> violation may expand or contract when influenced by other and non-numerical factors. Even an apparently narrow Window of Opportunity may sometimes be enough to avoid the necessary effect of a <u>Hicks</u> violation, whereas even an apparently wide Window of Opportunity may sometimes not be enough to ward off a <u>Hicks</u> violation. Other factors interact with the size of that Window of Opportunity. In measuring that window, we must never ignore the totality of the circumstances.

When the Nol Pros was entered in the Ross case itself, a full 88 days remained in that Window of Opportunity in Prince George's County. On the day of the Nol Pros, the State requested that the administrative judge grant a postponement beyond the Hicks date "for good cause" because drugs seized in the case had not yet been analyzed. The judge denied the request for a postponement and the State Nol Prossed the case. In this Court's opinion in Ross, we first pointed out that the State's purpose in entering the Nol Pros was clearly to circumvent the Hicks Rule:

> [I]mmediately following the judge's ruling, the State entered a nol pros in the case. We can discern no clearer attempt to circumvent the time period dictated by Art. 27, § 591 and Rule 4-271. We hold that the State entered the nol pros to circumvent the 180-day limit.

117 Md. App. at 370. (Emphasis supplied.)

This Court also held that a "necessary effect" of the Nol Pros would have been an unavoidable violation of the Hicks Rule. The State vigorously opposed such a ruling, citing State v. Brown (which will be fully examined infra.). In Brown the Supreme Court had held that a window of 43 days in Dorchester County, following a Nol Pros there, had been enough to ward off the necessary effect of a Hicks violation. The State protested that the Window of Opportunity in the present case was one of 88 days, over twice the Window of Opportunity available in Brown. "If 43 days had been sufficient there, why was 88 days not sufficient here?"

To answer that question, this Court's opinion turned to other non-numerical factors. In Brown, no ruling had ever been made by the trial judge that "good cause" did not exist to postpone the case beyond the Hicks deadline. Such a ruling, by contrast, had been made

18

in the Ross case. In terms of the "necessary effect" of the Nol Pros, the prospect for the State to avoid a Hicks violation in Brown looked very good. One of the ways in which a Hicks violation can be avoided is if the State, within the Window of Opportunity, moves for and receives a "good cause" postponement beyond the Hicks deadline. As this Court held, 117 Md. App. at 370, in Brown such a fortuitous circumstance was highly likely:

> Moreover, both parties had agreed that, if requested, a postponement for good cause would have been granted, and that there was a possibility that the case could have been brought to trial within the remaining forty-three days of the 180-day time period.

(Emphasis supplied.)

> In the Ross case, by contrast, the prospects were decidedly more foreboding:

> In the present case, there was a ruling by the administrative judge that the State's request for a postponement was not supported by good cause. The judge commented that the case could not be put back in. Our docket is too crowded. It can not be put back in before Hicks runs, and I am not finding good cause.

117 Md. App. at 369. (Emphasis supplied.)

The Ross opinion noted another frequently overlooked distinction in comparing one Window of Opportunity with another. In making the necessarily subjective judgment of whether the refiled charges can make it onto the trial docket within a given number of days, it is necessary to know which trial docket we are talking about. We are not talking about some Platonic trial docket in the sky. Are we talking about the arguably relaxed status of the criminal trial docket in Garrett or Somerset County or about the arguably more hectic status of the docket in Prince George's County or Baltimore City? In Brown, the court was

19

assessing the trial docket in Dorchester County. In <u>Ross</u>, the Court was dealing with the trial docket in Prince George's County. Those contexts were far from the same.

A conclusion in one such context will not necessarily apply in a very different context. In <u>Ross</u>, for instance, the administrative judge made the assessment that the case "cannot be put back in before <u>Hicks</u> runs." Appellate courts are very deferential to such judicial factfinding. This Court found, 117 Md. App. at 370, that the administrative judge is the party best able to venture an expert appraisal of the status of a particular jurisdiction's docket at a particular time. The Window of Opportunity is thus not a disembodied abstraction. It takes its life from a particular context at a particular time. Context is everything. One should never lift a fact out of its context and attempt to use it in a different context without considering whether the two contexts are comparable. This is especially so when comparing Windows of Opportunity.

## C. <u>State v. Price</u> (2003)

In <u>State v. Price</u>, the prong of the <u>Curley</u> exception that was found to exist, thereby resulting in a violation of the <u>Hicks</u> Rule, was not "the necessary effect prong" but rather the "purpose" prong. The 180-day count began to run on May 17, 2002. The <u>Hicks</u> date was November 13, 2002. On August 12, 2002, the State requested a continuance on the grounds that it had not yet received DNA results from the Crime Laboratory that the State deemed necessary for the prosecution of the case. The trial judge denied the State's request, noting that the State's reason was "not even a proper excuse, it's a pitiful excuse" and refusing to keep the defendant "sitting in jail." At that point, the State Nol Prossed the charges against the defendant. The defendant was reindicted on identical charges on

September 19, 2002. The defendant moved to have the charges dismissed for a violation of the <u>Hicks</u> Rule. A hearing was held on the motion to dismiss on November 27, 2002. As of the time the Nol Pros was entered, the Window of Opportunity was one of 97 days in Montgomery County.

Relying significantly on that 97-day Window of Opportunity, the Supreme Court agreed with the State, 385 Md. at 278, that the necessary effect of the Nol Pros did not itself violate the <u>Hicks</u> Rule:

> Thus, <u>the State is correct,</u> <u>the nolle pros did not have the "necessary effect"</u> <u>of circumventing the 180 day requirement</u> of the statute and the rule.

(Emphasis supplied.)

As the Supreme Court then turned its attention to the "purpose prong" of <u>Curley</u>'s two-pronged exception, its detailed examination of that prong is interesting. The Supreme Court zeroed in, essentially for the first time, on the fine nuance that the purpose prong of <u>Curley</u>'s two-pronged exception is itself two-pronged. The rule that the State may not purposefully violate concerns not only 1) the 180-day time limit itself but also 2) the explicit procedure for obtaining a continuance "for good cause" beyond the 180-day limit. The <u>Price</u> opinion, 385 Md. at 278, explained:

> [T]he statute and the rule, as the Court of Special Appeals and the Circuit Court recognized, have two aspects. Section 6-103 and Rule 4-271 set forth both a definite time requirement for the trial of criminal cases and an explicit procedure for postponing a case beyond the 180 day limit.

(Emphasis supplied.)

The State's request for a continuance and the administrative judge's ruling that there was no "good cause" to grant such a continuance clearly implicated such an "explicit procedure for postponing."

> In the case *sub judice*, <u>the State sought and was refused a continuance, the administrative judge expressly finding no good cause for one</u>. <u>The effect of that ruling was to mandate that trial proceed, as scheduled</u>. The consequence of the State not going forward or not producing evidence was dismissal of the case or an acquittal. <u>When the State nolle prossed the case, it was, as the State concedes, to avoid those results</u>.

385 Md. at 278. (Emphasis supplied.)

Our Supreme Court held that the purpose of the Nol Pros in the <u>Price</u> case, in the express words of the <u>Curley</u> exception, had been for the purpose of "circumventing the requirements of Sect. 591 and Rule 746."

> [R]ather, <u>it was for the purpose of circumventing, and, indeed, that intention was achieved, the requirement of the statute and the rule that trials proceed except when there has been a finding of good cause by the administrative judge</u>. Accordingly, we agree with the Court of Special Appeals that <u>the purpose for entering the nol pros in the case under consideration was to circumvent the authority and decision of the administrative judge</u>.

385 Md. at 278-79. (Emphasis supplied.)

The purpose prong of the <u>Curley</u> exception having been thus established, the 180-day countdown resumed at the point where the initial countdown had been interrupted by the Nol Pros. The ultimate trial did not begin until after the passing of the original <u>Hicks</u> date. All charges were properly dismissed.

**D. <u>Alther v. State</u> (2004)**

Alther was originally charged with a series of assault-related offenses. Alther's counsel entered his appearance on November 6, 2002, and the 180-day countdown under

22

Hicks began to run. The Hicks date was thus May 5, 2003. After the State received two postponements over defense objection, a trial date was set for May 1, 2003. On April 23, 2003, one week before the scheduled trial date, a new charging document was filed, accusing Alther of first-degree rape. The State moved to have the new rape charge consolidated with the pending assault-related charges and made a part of the trial scheduled for May 1, 2003. On April 30, 2003, the court denied the motion to consolidate and indicated that there would be no postponement of the scheduled trial.

On May 1, 2003, the State Nol Prossed the original assault-related charges. On the following day, May 2, 2003, new charges were immediately filed, consolidating the original assault-related offenses with the new charge of rape. Alther moved to have the charges dismissed based on a violation of the Hicks Rule. The Circuit Court denied Alther's motion to dismiss and the case proceeded to trial. Alther was convicted of second-degree assault.

This Court reversed the trial court and held that the Hicks Rule had been violated. The issue in the Alther case was whether the Nol Pros had implicated either prong of the two-pronged Curley exception. In our Alther opinion, this Court held that both prongs of the Curley exception had been established. We held, 157 Md. App. at 338:

> The entering of the nol pros on May 1, 2003, was for the purpose of avoiding the court's order denying consolidation, and its necessary effect, four days before the end of the 180-day period, was to circumvent the 180-day rule.

(Emphasis supplied.)

With respect to the "necessary effect" prong, when the Nol Pros was entered in this case, the Window of Opportunity was one of four days in Queen Anne's County. We observed, 157 Md. App. at 338:

> Although the State contends that it was prepared to go ahead with its case on May 1, 2003, <u>there is no possible way the case could have been refiled and tried in just four days once the nol pros was entered</u>.

(Emphasis supplied.)

Because the <u>Curley</u> exception did, therefore, apply, the 180-day countdown for the original charges resumed at the point where that countdown had been interrupted by the Nol Pros and consequently the trial date on the new charging document clearly violated the <u>Hicks</u> Rule:

> As appellant's trial was not held within the initial 180-day period, as required by Rule 4-271 and § 6-103, and as <u>these requirements are mandatory, dismissal of the charges against appellant is the appropriate sanction</u>.

157 Md. App. at 338. (Emphasis supplied.)

## E. <u>Wheeler v. State</u> (2005)

The last of the five cases of the Nol Pros/reindictment sub-genre in which the <u>Curley</u> exception applied and in which the <u>Hicks</u> Rule was violated is <u>Wheeler v. State</u> (2005). Wheeler was ultimately convicted of first-degree murder. Defense counsel had entered his appearance on September 23, 2002 and the <u>Hicks</u> date was therefore March 22, 2003.

The trial date was set for March 3, 2003, 19 days before the <u>Hicks</u> date. On that day, the State requested a continuance in order to obtain DNA testing results from the Crime Laboratory. The trial judge denied the State's request for a continuance:

> Judge Schiff denied the State's request for a continuance and expressly found that the prosecutor's reasons for the continuance did not amount to good cause to go past the <u>Hicks</u> date.

165 Md. App. at 216.

With the denial of the continuance, the State Nol Prossed the case. The Window of Opportunity that remained was one of 19 days, in Prince George's County. Wheeler was reindicted on July 10, 2003. Wheeler moved to have all charges dismissed because of a <u>Hicks</u> Rule violation.

In terms of the State's purpose in entering the Nol Pros, the trial court credited the State's assertion that the Nol Pros was not intended to circumvent the <u>Hicks</u> Rule. The prosecution honestly believed that the Nol Pros would toll the running of the 180-day count and that 19 days would remain in the count following the reindictment. This Court affirmed the ruling of the trial judge that the "purpose" of the Nol Pros had not been to circumvent the <u>Hicks</u> date:

> [W]e conclude that <u>the motions judge did not err in finding, impliedly, that the *nol pros* was not entered for the purpose of evading the 180-day requirement</u>. Although the prosecutor indicated that she had entered the *nol pros* in order to toll the running of the 180-day period, <u>she was proceeding under the erroneous belief that she could stop the prosecution, carry the remaining nineteen days forward, and apply those nineteen days to the second prosecution</u>.

165 Md. App. at 232. (Emphasis supplied.)

The Nol Pros had, however, the "necessary effect" of circumventing the <u>Hicks</u> Rule. This Court reversed the trial court and held that all charges would have to be dismissed.

### 2. <u>Curley</u> Exception Did Not Apply:<br>**<u>Hicks</u> Rule Therefore Was Not Violated**

25

Just as half of the cases in the <u>Curley</u> exception sub-genre held that the exception was applicable and that the <u>Hicks</u> Rule had been violated, five others held that the exception did not apply and that the <u>Hicks</u> Rule had not been violated. Together, the ten cases effectively cover the waterfront.

**A. <u>State v. Glenn</u> (1984)**

<u>State v. Glenn</u> was filed on the very same day that <u>Curley v. State</u> was filed. In communicating the new principle that was decided that day, this bracket of cases [<u>Curley</u> plus <u>Glenn</u>] was doubly instructive because each decision went a different way. Both opinions, moreover, were written by Judge Eldridge. They were persuasively compatible.

In <u>Glenn</u>, the defense counsel first entered his appearance on July 17, 1981. The <u>Hicks</u> date was, therefore, January 13, 1982. A trial date was set for November 17, 1981. Just prior to the trial date, the State realized that in one critical aspect the indictments were badly drawn and would have to be amended. On the scheduled trial date, the State Nol Prossed the indictment. On that very same day, the amended indictments were filed. A new trial date of March 29, 1982 was scheduled. Defense counsel moved, however, to dismiss the charges on the ground that the Nol Pros of the original charges had caused a violation of the <u>Hicks</u> Rule. The trial judge agreed with the defense and dismissed the charges. On the State appeal, the Appellate Court of Maryland affirmed the trial court. On *certiorari* to the Supreme Court of Maryland, the trial court and the Appellate Court of Maryland were reversed. The Supreme Court held that the Nol Pros had not in any way countermanded the <u>Hicks</u> Rule and that no trial error had occurred.

Applying the new <u>Curley</u> exception to the Nol Pros, the Supreme Court of Maryland

ruled first that the purpose of the Nol Pros had not been to counteract the <u>Hicks</u> Rule:

> In the instant cases <u>the prosecuting attorney's purpose in nol prossing the
> charges was not to evade § 591 and Rule 746</u>. The record clearly establishes,
> with no basis for a contrary inference, that <u>the charges were nol prossed
> because of a legitimate belief that the charging documents were defective
> and because the defendant's attorney would not agree to amendment</u> of the
> charging documents.

299 Md. at 467. (Emphasis supplied.)

Turning to the "necessary effect" prong of the <u>Curley</u> exception, the Supreme Court

held that there were still 57 days remaining in the Window of Opportunity (in Prince

George's County) and that there was no reason the trial could not have been held during

that period:

> If the cases had not been nol prossed, and if for some reason trial had not
> proceeded when the cases were called on November 17[th], <u>there remained
> fifty-seven days before the expiration of the 180-day deadline</u>.

299 Md. at 467. (Emphasis supplied.) *See also* <u>State v. Phillips</u>, 299 Md. 468, 474 A.2d

512 (1984) (a very brief and routine application of <u>State v. Glenn</u> without any meaningful

analysis, also written by Judge Eldridge). <u>Hicks</u> was not violated.

**B. <u>State v. Brown</u> (1996)**

<u>State v. Brown</u> followed uneventfully in the slipstream of <u>State v. Glenn</u>.[2] Defense

counsel entered his appearance on May 21, 1993. The <u>Hicks</u> date was thus set as of

---

[2]    The opinion was also authored by Judge Eldridge. As this Court noted in <u>Baker v.
<u>State</u>, 130 Md. App. 281, 286, 745 A.2d 1142 (2000):

November 17, 1993. On the trial date of October 5, 1993, the State Nol Prossed the case. The clear purpose of the Nol Pros was because the State had not yet received DNA testing results from the Maryland State Police Crime Laboratory, results which all parties conceded were necessary for trial. Following reindictment, Brown moved to have all charges dismissed for a Hicks Rule violation. The trial judge agreed with the State and denied the motion to dismiss. The Maryland Appellate Court reversed the trial court and held that the Hicks Rule had been violated. On *certiorari*, the Supreme Court of Maryland in turn reversed this Court and held that the Nol Pros would not have had the necessary effect of causing a violation of the 180-day Hicks mandate.

This entire case turned on the "necessary effect" prong of the Curley exception. The Supreme Court of Maryland agreed with the State that the "necessary effect" prong had not been established:

> We agree with the State that the decision of the Court of Special Appeals is inconsistent with the principles set forth in the Curley and Glenn opinions.

341 Md. at 615.

When on October 5, 1983, the Nol Pros was entered, there was still a Window of Opportunity of 43 days (in Dorchester County). In addition to the time remaining of 43 days, the Supreme Court of Maryland reminded us that there were other factors favorable to the State's likelihood of being able to get the case timely tried:

> It is obvious that the nol pros in the case at bar did not have the necessary effect of an attempt to circumvent the requirements of § 591 and Rule 4-271.

---

All three of the opinions by the Court of Appeals [Curley, Glenn, and Brown] were authored by Judge Eldridge and maintain, therefore, a solid doctrinal consistency and an unambiguous message.

> If the case had not been nol prossed on October 5, 1993, there would have been 43 days before the expiration of the 180-day period. In this respect, the case is very much like the Glenn case. During this 43-day period, the State's Attorney's office may have been able to expedite the DNA testing and obtain the results so that trial of the case could have begun before the deadline. Alternatively, the State's Attorney's office may have obtained from the administrative judge, in accordance with § 591 and Rule 4-271, a good cause postponement of the trial to a date beyond the 180-day period. There was clearly a basis for such postponement.

341 Md. at 620. (Emphasis supplied.) The circumvention of the Hicks Rule was not a "necessary effect" of the Nol Pros. Hicks was therefore not violated.

## C. Baker v. State (2000)

Of the five cases holding that the Curley exception did not apply and that the Hicks Rule, therefore, was not even involved, let alone violated, Baker v. State is the most insightful. It resurveys the entire sub-genre of Curley exception law, fleshing out some of the sub-genre's analysis along the way. With respect to the allocation of the burden of proof as to the Curley exception itself, Baker, 130 Md. App. at 288-89, makes explicit what should have been implicit but had never been expressly stated:

> [T]he burden is not on the prosecutor to persuade a skeptical court that the norm applies. The burden is on the defendant to establish that the exception to the norm applies.

The norm itself is presumptively established. That's what it means to be the norm. And what is that norm? Baker again, 130 Md. App. at 288, makes that expressly clear:

> This then is the norm – the accepted way of counting to 180. When earlier charges are *nol prossed* and new charges are subsequently filed, the new charges have a life of their own. A new and independent 180-day count begins with respect to them.

(Emphasis supplied.)

29

In the Baker case itself, a criminal information had originally charged the defendant with child abuse and other offenses. The Wicomico County Public Defender entered his appearance on September 14, 1998. The Hicks date was March 14, 1999. On the scheduled trial date of February 23, 1999, the State Nol Prossed all charges. Six days later, on March 1, 1999, an indictment followed on the single charge of child abuse. Almost three months later, after the original 180-day countdown would have run its course, Baker filed a motion to dismiss all charges for a violation of the Hicks Rule. The trial judge denied the motion.

The trial judge found and this Court affirmed that the Nol Pros had not been entered for the "purpose" of circumventing the Hicks Rule:

> In this case, there is no question that the *nol pros* did not have the purpose of circumventing the 180-day requirement. At the outset of the hearing on the appellant's motion to dismiss, the prosecutor averred to the court his subjective state of mind at the time of entering the *nol pros*:
>
>> Initially, when this case was *nol prossed* on February 23, 1999, I can indicate to the Court that actually the 180 day Rule had never entered into my mind.
>
> In denying the motion to dismiss, Judge Davis implicitly accepted as a fact that the prosecutor had no deliberate purpose to circumvent the 180-day rule.

130 Md. App. at 289. (Emphasis supplied.)

This case would ultimately turn on the "necessary effect" prong of the Curley exception. As Baker stated:

> It is the second prong of the exception that concerns us here, to wit, whether the *nol pros* had the **necessary effect** of circumventing the rule.

130 Md. App. at 290. (Emphasis supplied.)

30

As this Court expanded that analysis, it fleshed out the existing caselaw by stressing the critical distinction between that "actual effect" of a Nol Pros and the "necessary effect" of a Nol Pros:

> [T]he Court of Appeals has drawn a <u>critical distinction between 1) a *nol pros* that merely has the **actual effect** of carrying a trial beyond the 180-day limit and 2) a *nol pros* that has the **necessary effect** of carrying a trial beyond the 180-days limit</u>. Only the latter will foreclose the trial from going forward. <u>The cases, moreover, have adopted a very narrow interpretation of the modifying adjective and adverb **necessary** and **necessarily**</u>.

130 Md. App. at 290. (Emphasis supplied.)

The <u>Baker</u> opinion then provided, 130 Md. App. at 299, the necessary mechanism for distinguishing an actual effect from a necessary effect:

> <u>Defendants in cases such as this are understandably susceptible to the logical fallacy of "*Post hoc; ergo, propter hoc*." They want to reckon backward from what, to them at least, is an undesirable **effect**, pointing the finger of blame at an earlier event (the *nol pros*) that unquestionably was at least a contributing **cause** to that **effect**</u>. When they do this, however, their conclusions are skewed because their temporal vantage point is wrong. It is the teaching of <u>Curley</u>, <u>Glenn</u>, and <u>Brown</u> that <u>we do not assess the situation by looking backward from the arguably adverse **effect**, searching for a cause. A mere **cause and effect** relationship is not enough. We look, rather, from a potential **cause** forward, asking</u> not whether the feared **effect** is a predictable possibility but <u>whether it is, **as of that moment**, already a foregone conclusion – **necessary effect**, an unavoidable consequence, a virtual inevitability. We assess the situation as of the day the *nol pros* is entered</u>.

(Emphasis supplied.)

Looking from the time of the entering of the Nol Pros forward, moreover, as <u>Baker</u> advised, there were alternatives to the dismissal of the charges:

> <u>On the day the *nol pros* was entered</u>, February 23, <u>the dismissal of all charges against the appellant for a violation of the 180-day rule was not the **only** alternative to the *nol pros*</u>. On that day or <u>on any of the nineteen days that followed, the State could still have proceeded to trial, using the nine-year-

old victim as its chief prosecution witness, notwithstanding the fact that it might not have been in the child's best interest.

130 Md. App. at 302. (Emphasis supplied.)

In looking at the Window of Opportunity, the Baker opinion also drew an interesting contrast between its own facts, wherein a Window of Opportunity of 19 days was deemed to be enough to avoid a necessary effect of violating Hicks, and Ross v. State, in which a significantly larger Window of Opportunity of 88 days had been deemed to be not enough to avoid such a necessary effect:

> *Ross v. State* was dealing with the very crowded and highly automated court docket in Prince George's County. There was no indication in this case that Wicomico County by contrast, could not have found a way, if necessary, to fit this case into its trial schedule.

130 Md. App. at 302. (Emphasis supplied.) Nineteen days in Wicomico County may thus be a bigger Window of Opportunity than 88 days in Prince George's County. There is a lesson there and it is not subtle. Context! CONTEXT! **CONTEXT!** In Baker, the Curley exception did not apply and there was therefore no Hicks Rule violation.

**D. State v. Akopian (2004)**

In State v. Akopian, the defendant was charged in Montgomery County with robbery. A privately retained attorney first entered his appearance on June 20, 2002, thus starting the running of the 180-day countdown. The Hicks date was December 17, 2002. At a trial date set for October 22, 2002, the State requested a continuance for a single day, so that a necessary police witness could be available. The administrative judge denied the State's request. He reassured the State, however, that because the case was scheduled to be a jury trial, by the time a jury had been selected and opening statements to the jury had

32

been given, the case would necessarily carry over into a second day and the State would have its missing officer present. When the case was returned to the judge assigned to hear the case, however, the defense employed an imaginative strategic ploy. It waived a jury trial and announced that it was ready to proceed immediately. On that day, October 22, 2002, the State, left with no other option, Nol Prossed the case. The defendant was almost immediately reindicted, on October 24, 2002, two days later. At the time of the Nol Pros, 56 days remained in the Window of Opportunity.

The defendant moved to have all charges dismissed, claiming that the necessary effect of the Nol Pros was that the Hicks date would inevitably be violated. Notwithstanding the Nol Pros of the original charge, the State attempted to set a new trial date on several occasions, all before the original Hicks date of December 17, 2002. On each occasion, the effort was frustrated by Akopian's failure to appear with trial counsel. The court was in regular contact with the Public Defender's Office, but that office responded that Akopian declined to be represented by them and insisted on obtaining private representation. The court's many interventions with Akopian himself and with his family were unproductive.

When the trial did not go forward on December 11, 2002, defense counsel filed a motion to dismiss all charges on the ground that the Nol Pros had caused a Hicks violation. At the end of a hearing on that motion on December 20, 2002, the trial judge, with some discernable reluctance, granted the motion. The State appealed.

The prong of the <u>Curley</u> exception that commanded the attention of this Court on appeal was the "necessary effect" provision. On the basis of that exception, the Appellate Court of Maryland did not hesitate to reverse the trial court:

> <u>Because there were more than fifty days remaining in the original *Hicks* calendar</u> when the *nolle prosequi* was entered on October 22, 2002, <u>the State's action</u>, in and of itself, <u>did not have the necessary effect of circumventing the 180-day rule</u>.

155 Md. App. at 139. (Emphasis supplied.)

This Court did not hesitate to place the lion's share of the blame for the trial delay beyond the <u>Hicks</u> deadline not on the Nol Pros by the State but on the ineffective effort by the defendant to procure trial counsel:

> It is abundantly clear from the record that <u>the State made extraordinary effort to obtain a trial date well within the outside limit of the original 180-day calendar</u>. In every instance <u>the State's effort was thwarted by appellee's appearance without counsel and</u>, what we conclude to be, <u>his refusal to be represented</u>.

155 Md. App. at 143. (Emphasis supplied.)

In assessing the "necessary effect" of the Nol Pros, we also took note of the Window of Opportunity:

> <u>We cannot discern from the record facts that would indicate that the State's use of a *nolle prosequi* had either the necessary effect or the purpose of circumventing the 180-day rule, as more than fifty days remained in the Hicks period</u>.

155 Md. App. at 142. (Emphasis supplied.) The number of days remaining before the <u>Hicks</u> date was 56. <u>Hicks</u> was not violated.

**E. <u>State v. Huntley</u> (2009)**

In this case, the Curley exception focuses exclusively on the "purpose" prong of the Nol Pros. Huntley was charged with child sexual abuse in Wicomico County. He first appeared before the circuit court on September 6, 2007, thus triggering the 180-day Hicks countdown. The Hicks trial deadline was March 4, 2008. A trial date was set for March 3, 2008, one day before the Hicks date.

In the week preceding the trial date, the State learned from the victim's family that dates of the alleged child abuse in the indictment were incorrect. On March 3, the State moved for a continuance so that the indictment could be amended to reflect the correct dates. The trial court denied the State's motion. The State Nol Prossed the charge. The Grand Jury filed a corrected indictment on March 24, 2008. Huntley filed a motion to have all charges dismissed because of the State's violation of the Hicks Rule. The trial court granted Huntley's motion. The State appealed.

At the hearing on the motion, the trial court found, very precisely, that "the purpose of the State's nol pros in March of 2008…was to evade the effect of [the earlier judge's] ruling denying the motion to amend." 411 Md. at 293. The State challenged the trial court's ruling, arguing that the purpose of the Nol Pros was not to countermand the 180-day requirement but was, rather, to circumvent the trial judge's denial of the State's motion to amend the wording of the indictment. As the Huntley opinion characterized the State's argument:

> It maintains that, because the nol pros was designed to respond to the trial court's denial of its motion to amend the indictment, rather than to evade or circumvent the 180-day deadline, the *Curley* exceptions and *Hicks* are not in play here.

411 Md. at 295. (Emphasis supplied.)

Judge Harrell's opinion for the Supreme Court agreed with the State's analysis:

We agree with the State and hold that, where the State nol prosses an indictment based on the denial of its motion to amend a flawed indictment, absent bad faith or evidence of the State's motive to delay trial, *Curley* and *Hicks* do not compel dismissal of the subsequent indictment.

411 Md. at 295-96. (Emphasis supplied.)

What followed in the Huntley opinion was a probing and thorough analysis of the Curley exception's "purpose" prong. The opinion concluded:

We hold that the *Curley* two-pronged exceptions test, and the concurrent *Hicks* sanction of dismissal, are inapplicable where the State's nol pros follows a denial of its motion to amend an indictment, at least where bad faith on the part of the State to delay is not shown. This Court designed the *Curley* exceptions in order to prevent the State from using its nol pros power to evade the 180-day deadline and delay trial of a defendant's case beyond 180 days. Where the State's nol pros instead is used to remedy a genuinely flawed indictment, the concerns of *Curley* are not present.

411 Md. at 302. (Emphasis supplied.) The Hicks Rule was not violated.

## Required Reading

A final word is in order about State v. Huntley. It is a 5-2 decision of the Supreme Court. The majority opinion by Judge Harrell and the dissenting opinion by Judge Greene focus, in combination, more attention on the "purpose" prong of the Curley exception than all of the pre-existing caselaw combined. The attention is not even on the primary purpose of the Nol Pros but on its possible secondary or incidental purpose. The two opinions grope for clues from the caselaw that the caselaw itself, not having engaged in such nuanced analysis, may never had consciously emitted. If one were aspiring not to a good undergraduate level of understanding but to a master's degree or Ph.D. in the "purpose

prong" of the <u>Curley</u> exception, <u>State v. Huntley</u> would be required reading. It is a brain-stretching exercise.

## A <u>Curley</u> Exception Synopsis

This then is the <u>Hicks</u> Rule sub-genre for the <u>Curley</u> exception. In five of the cases, the <u>Curley</u> exception applied and the trial was not held, or inevitably could not have been held, within the 180-day <u>Hicks</u> deadline for the original charges. The <u>Hicks</u> Rule was thereby violated. In another five of the cases, the <u>Curley</u> exception did not apply. It was here that State appeals figured most prominently. The original charges were extinguished by the Nol Pros and became completely irrelevant. A fresh 180-day countdown only began after fresh charges had been filed and the <u>Hicks</u> Rule, per the new countdown, was not violated. This is the metric by which we shall measure the case at hand.

## The Present Case

The appellant was convicted on April 11, 2022 of having murdered Lillian Herndon at her home in Baltimore City. After some preliminary procedural skirmishing in the District Court of Maryland, not relevant to this opinion, the appellant was indicted on June 24, 2020. Defense counsel entered his first appearance on July 2, 2020. The 180-day calendar pursuant to the <u>Hicks</u> Rule would ordinarily have begun to run on that day. At the height of the Covid-19 pandemic, however, both the scheduling of trials and the subpoenaing of witnesses were cast into a state of near pandemonium. After several trial dates were scheduled, postponed, and rescheduled, an important status hearing was held before Judge Melissa Phinn on July 26, 2021. At that hearing, problems began to surface.

At least one of them was solved. Without any serious objection, **THE ADJUSTED HICKS DATE WAS ESTABLISHED AS OCTOBER 11, 2021**.

At that hearing on July 26, 2021, however, when Judge Phinn scheduled a trial date for October 5, 2021, the State announced that it might have difficulty going to trial in October. The assistant medical examiner, Dr. Diana Nointin, who had performed the autopsy on the murder victim and who was deemed to be an essential witness was in Malaysia and, because of pandemic-related delays, could have difficulty getting back into the country. In August the State learned that Dr. Nointin was not expected to return to the United States until November of 2021. Accordingly, the State on August 5, 2021, requested that the scheduled trial date of October 5, 2021 be postponed. It was not until October 1, 2021, four days before the scheduled trial date, that a hearing was held on the State's request for a postponement. At the conclusion of that hearing, Judge Phinn, observing that Dr. Nointin "may never return" and that she "cannot continue to keep defendants in jail," denied the State's request for a postponement.

On the scheduled trial date of October 5, 2021, the appellant appeared only by Zoom because the State had alerted him that it would be seeking another postponement. The State did so request a postponement from Judge Philip S. Jackson. Judge Jackson denied the request, saying that he was following Judge Phinn's earlier decision. At that point, the State Nol Prossed the charges against the appellant. The Window of Opportunity was thus one of six days.

On November 15, 2021, just over a month later, the Grand Jury reindicted the appellant with the same charges. On that same day, the appellant filed a motion to dismiss

all charges because of a <u>Hicks</u> Rule violation. The critical hearing on that motion was held before Judge Erik S. Atas on December 15, 2021. At the end of the December 15, 2021 hearing, Judge Atas took the matter under review and indicated that he would issue a written order. He did so on December 17, 2021.

## The <u>Curley</u> Exception To The Norm

In his six-page order of December 17, 2021, Judge Atas found specifically that the State's entry of the Nol Pros on October 5, 2021 did not trigger the <u>Curley</u> exception and that the <u>Hicks</u> Rule was not, therefore, violated.

**A. The Purpose Prong**

With respect to the "purpose prong" of the <u>Curley</u> exception specifically, Judge Atas made several carefully considered findings of fact. They were:

> **FOUND** that the State's Attorney acted in good faith when she entered a nolle prosequi in case# 120174048; and it is further
>
> **FOUND** that, as to the first *Curley* exception, <u>the State's purpose was not to circumvent MD Crime Proc § 6-103 and MD Rule 4-271</u> because, had this same witness become available prior to the *Hicks* date but after a scheduled trial date also within that *Hicks* date, the State's Attorney would have sought the exact same postponement request.

(Emphasis supplied.)

When the State entered the Nol Pros on October 5, 2021, its purpose was clearly not to be forced to go to trial on that day without Dr. Nointin as a witness. That purpose would have been the same whether the <u>Hicks</u> date was six days away or sixty days away. The "purpose" was not to circumvent <u>Hicks</u>. The State's purpose of not going to trial without the availability of Dr. Nointin would have been there at that time even if the <u>Hicks</u> Rule

39

had never existed. Indeed, the State's purpose would steadfastly have remained unchanged even if a newsboy had suddenly burst into the courtroom shouting the news that the Legislature had just repealed the <u>Hicks</u> Rule, <u>to be effective immediately</u>. That would not have eroded the State's independent purpose of using the Nol Pros to avoid having to go to trial then and there without a post-mortem examiner. The purpose of the Nol Pros was not to circumvent <u>Hicks</u>.

## B. The Necessary Effect Prong

With respect to the "necessary effect" prong of the <u>Curley</u> exception, Judge Atas found specifically:

> **FOUND** that, as to the second *Curley* exception, a nolle prosequi will have the "necessary effect" of an attempt to evade the requirements of MD Crime Proc § 6-103 and MD Rule 4-271 *only* when the alternative to the nolle prosequi would have been a dismissal with prejudice for noncompliance with MD Crime Proc § 6-103 and MD Rule 4-271. *Baker v. State*, 130 Md. App. 281, 293 (2000) citing *State v. Glenn*, 299 Md. 464 (1984). Accordingly, <u>when the State entered a nolle prosequi in case #120174048, it was done prior to the Defendant's *Hicks* date. As such, the alternative to a nolle prosequi for the State's Attorney was not a dismissal with prejudice for noncompliance with MD Crime Proc § 6-103 and MD Rule 4-271</u>. <u>The State's Attorney had at least two other options available</u>. Those options were (1) proceeding to trial without the testimony of the Medical Examiner and attempting to prove by circumstantial evidence Count 1, to wit: Murder in the First Degree, and (2) proceeding to trial on Count 2, to wit: False Imprisonment, which does not require any testimony from a Medical Examiner; and it is therefore

> **ORDERED** that, <u>as to the Defense's argument that the State violated MD Rule 4-271 and MD Crime Proc § 6-103, the Defendant's Motion to Dismiss With Prejudice is DENIED</u>.

(Emphasis supplied.)

We do not credit as an alternative to the "dismissal with prejudice" to the charges what Judge Atas characterized as the second option of "(2) proceeding to trial on Count 2,

to wit: False Imprisonment, which does not require any testimony from a Medical Examiner." We think an assessment of a claim involving the <u>Hicks</u> Rule and its <u>Curley</u> exception needs to be made with reference to the flagship count of a multi-pronged indictment and not with reference to some lesser included count further down the descending chain. The lesser included offenses are loaded with divergent criminal elements some of which might be vulnerable, and others invulnerable, to divergent impacts from the <u>Curley</u> exception's "necessary effect" prong. Our focus is on the flagship count and nothing else. We will, therefore, confine our review to what Judge Atas characterizes as the "first option" of an alternative to going immediately to the trial table.

## Appellate Deference

The outcome of the case before us turns upon that factfinding by Judge Atas in his six-page Order of December 17, 2021. To assist in our assessment of that factfinding, the caselaw that has grown up around the <u>Curley</u> exception sub-genre since 1985 is replete with helpful guidelines.

There is always, of course, the question of the allocation of the burden of proof. As we have already discussed, <u>Baker v. State</u>, 130 Md. App. at 288-89, in 2000 reaffirmed the universally recognized standard:

> [T]he burden is not on the prosecutor to persuade a skeptical court that the norm applies. <u>The burden is on the defendant to establish that the exception to the norm applies</u>.

(Emphasis supplied.)

The norm itself is presumptively established. The norm is that the Nol Pros has rendered the earlier charges and their trial schedules irrelevant. The norm is that any

41

subsequently refiled charges will generate completely new and independent trial schedules of their own. Pursuant to such a norm, the State wins the present case. There will have been no violation of the <u>Hicks</u> Rule.

It is the defendant who must prove the <u>Curley</u> exception to that norm. Only then does the earlier 180-day countdown resume. Only then can the appellant prevail in this case. In a state of irresolute uncertainty, the State will prevail. The very allocation of the burden of proof establishes that the State wins the tie.

The caselaw goes further in providing helpful guidelines. In rendering many trial rulings, trial judges are necessarily involved in judicial factfinding. As a universal appellate principle, appellate review accepts the facts as found by the trial judge, provided only that such judicial factfinding was not clearly erroneous. Once again, the doubtful case is resolved in favor of affirming the trial judge's factfinding.

As we have already discussed, <u>Ross v. State</u> is especially helpful in this regard. Appellate deference is the overriding guideline. That deference is doubly due when the trial judge was making his professional assessment of the feasibility of trying a case in his jurisdiction at a particular time. Judge Atas was far closer to both the parties and to the total circumstances of the case than more distant appellate review can possibly be. His finger was sensitively on the pulse of the case. In his assessment, it was feasible for the State to take this case to trial even without Dr. Nointin as a witness. We are duly deferential to his on-the-field judgment call.

With respect to that "first alternative," we note that for a thousand years the Anglo-American common law successfully prosecuted cases of murder and manslaughter before

the very notion of a post-mortem examination had even been contemplated. A dead body, with a bullet hole in the middle of its forehead or crushed under the wheel of a truck, can sometimes speak for itself. The testimony of Dr. Quincy never was, and is not now, an indispensable element of criminal homicide. *See*, e.g., <u>Lemons v. State</u>, 49 Md. App. 467, 486, 433 A.2d 1179 (1981); <u>Hurley v. State</u>, 60 Md. App. 539, 549, 483 A.2d 1298 (1984), <u>cert. denied</u>, 302 Md. 409, 488 A.2d 500 (1985). We affirm part one of Judge Atas's two-pronged ruling that the <u>Curley</u> exception did not apply and that the <u>Hicks</u> Rule therefore was not violated.

### Entr'Acte

That first act, just concluded, examined closely Maryland's statutory right to a speedy trial. There will follow a second act. That does not, however, necessarily portend any narrative continuity. The only common denominator between this opinion's two contentions was the appellant's general aspiration to have the charges against him resolved as quickly as possible. The statutory implementation and the constitutional implementation of that general aspiration, however, varied widely. They may have had the same goal in mind but they involved far different approaches to that goal. It is the difference between a close textual reading of a statute and more abstract philosophizing. The statutory speedy trial provision is simply not a sub-set of the constitutional speedy trial right.

In his first contention, the appellant pursued that aspiration at a more mundane but also at a more intense State level. He focused on his Maryland statutory right to a speedy trial pursuant to the <u>Hicks</u> Rule. The <u>Curley</u> exception was also intimately involved. In his

second contention, by contrast, he aspired to a speedy trial at a more ethereal or stratospheric level, as a fundamental constitutional entitlement. Those two rights vary sharply in their implementation. Only in the most general sense are these two acts of implementation even part of the same play. The two contentions present us, in effect, with two separate appeals.

On the statutory challenge, the appellant mounted a sophisticated argument pursued with commendable plausibility. It raised several nuanced legal questions. It was a weighty contention vigorously pursued.

The more stratospheric constitutional challenge, by contrast, was only added to the appellant's arsenal late in the game, midway through the December 15th hearing before Judge Atas. It announced in effect, "And, oh, by the way, <u>we are also invoking our constitutional speedy trial challenge</u>." (Emphasis supplied.) That added challenge was pursued far more cursorily and at a discernibly lower level of intensity. One has to wonder exactly what strategic purpose it served. It is hard to imagine a scenario wherein a defendant could fail to prevail at the statutory speedy trial level but might nonetheless prevail at the constitutional level. We are unaware of any such case.[3] The inevitable question therefore becomes, "Why then bother with such a contention?"

---

[3]     As Judge McDonald noted in <u>Tunnell v. State</u>, 466 Md. at 572:

> <u>Compliance with the Hicks rule would also presumably satisfy the constitutional constraint.</u> *See* 5 W. LaFave, et al., Criminal Procedure § 18.3(c) & n. 71 (4th ed. Dec. 2019 update) (<u>noting that state speedy trial statutes usually impose stricter time limits than the constitutional standard</u>).

(Emphasis supplied.)

This second contention, nonetheless, may have a special value of its own. Whereas the statutory claim required us to examine, in depth, some interesting and challenging legal nuances of the <u>Hicks</u> Rule and of the <u>Curley</u> exception, the constitutional claim, even if less legally weighty, may serve as a valuable teaching tool. What lesson does it have to teach? Let the curtain rise for Act Two.

### A Second Fiddle Contention: "Through A Glass Darkly"

It is clear that the appellant's second contention involves the constitutional right to a speedy trial as guaranteed by the Sixth Amendment of the United States Constitution and by Article 21 of the Maryland Declaration of Rights. That constitutional right to a speedy trial was actually ruled upon in this case no less than three times on no less than three occasions by no less than two different circuit court judges. Which of these is being challenged? We cannot tell and the appellant does not tell us.

The major hearing on all pre-trial motions in this case was conducted before Judge Atas on December 15, 2021. In that comprehensive orchestration of the appellant's various rights to have the criminal charges against him promptly disposed of, the constitutional speedy trial right was reduced to playing a distinctly second fiddle. It was only an added starter. At both the pretrial hearing level and at the appellate level, this case has been largely a clash over the <u>Hicks</u> Rule and the <u>Curley</u> exception. Those were weighty issues seriously pursued.

The constitutional speedy trial challenge did at that hearing, however, at least make it onto the stage for the first time. As the appellant now phrases it in his brief, "[D]efense counsel clarified that although his major argument was that the State improperly circumvented the Hicks 180-day rule outlined in Rule 4-271, he was also making a constitutional speedy trial argument." (Emphasis supplied.) That constitutional speedy trial argument, however, was little more than an afterthought. After a passing examination of that largely secondary claim, Judge Atas ruled that a constitutional speedy trial violation had not occurred.

On February 25, 2022, the appellant filed a Motion for Judge Atas to Reconsider his ruling of December 15, 2021 with respect to both his ruling on the Hicks Rule but also on the speedy trial issue. On March 2, 2022, Judge Atas denied that Motion to Reconsider on both grounds. At the beginning of the trial proceeding on September 26, 2022, the appellant again renewed his Motion to Dismiss on the basis of both his Hicks Rule claim and his constitutional speedy trial claim. After relatively brief argument immediately prior to jury selection, Judge Bryant ruled, inter alia, that the appellant had not suffered a violation of his constitutional right to a speedy trial.

As of this date, the appellant has yet to tell us expressly which precise ruling by which precise judge on which precise occasion is formally being challenged. Even with respect to essentially the same subject matter, three rulings by two judges simply do not coalesce into a single appealable ruling by a single judge. Although the appellant may protest that there are clues strewn about from which we might make an educated guess, an appellate review panel is entitled to know, explicitly, which precise ruling is being

46

challenged. Those clues, moreover, go in more than one direction. The appellant simply did not want to be pinned down. On page 29 of his brief, he tells us, "This was true <u>at the hearing before Judge Atas on December 15, 2021</u>, and it was especially true <u>by the start of the trial in September 2022</u>." (Emphasis supplied.) Which judge and which decision then are we reviewing? Shortly thereafter, the appellant was similarly elusive, "<u>Judge Atas recognized that</u> Mr. Griffin had repeatedly asserted his speedy trial right, and on September 26, 2022, <u>Judge Bryant commented that</u> there is no question the Defendant asserted his right to a speedy trial at every turn." (Emphasis supplied.) Are we assessing more than one error? For this drama, both the stage and the cast of judicial decision makers need to be drastically reduced.

It is difficult to come to grips squarely with a contention when we are not told, except in the most general sense, precisely what the contention is. As a traditional writ of error in days of yore, such a pleading would have been deemed fatally ambiguous. Rather than dismiss this contention summarily, however, we will walk through a generic constitutional speedy trial analysis and see if anything about this appellant's circumstances at any time leaps off the page for special attention.

### Barker v. Wingo (1972)

Although the constitutional right to a speedy trial has roots that go back more deeply into Supreme Court history, the right, as it is universally understood and applied today, is

the product of <u>Barker v. Wingo</u>, 407 U.S. 514, 925 S. Ct. 2182, 33 L.Ed.2d. 101 in 1972.[4]

Absolutely central to a <u>Barker v. Wingo</u> analysis is an ultimate inter-balancing of no less than four critical factors. The Supreme Court laid them out, 407 U.S. at 530:

> A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, <u>we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant</u>.

(Emphasis supplied.)

As we begin the process of examining those four factors, one by one, it is the first of them – length of delay – that leaps off the page as demanding special initial attention. This is not because of any impact that the length of delay might have on the ultimate merits of the case. On that ultimate question, the length of delay will actually have relatively little impact. It is with respect to a very different issue, the careful and cautious use of language in appellate argument, that the "length of delay" factor calls for special comment in this case.

### "Length Of Delay" As A Trigger Mechanism Versus "Length Of Delay" As One Factor To Be Weighed

In speedy trial analysis, the factor that is called "length of delay" is, confusingly, a bit of a <u>doppelganger</u>. It has not one but two separate identities, each serving a very

---

[4]    Justice Powell's opinion, after noting that "this Court has dealt with the right on infrequent occasions," 407 U.S. at 515, cited seven such earlier occasions, dating back to <u>Beavers v. Haubert</u>, 198 U.S. 77, 25 S. Ct. 573, 49 L.Ed. 950 in 1905. The opinion then further noted that "in none of these cases have we attempted to set out the criteria by which the speedy trial is to be judged."

different function or purpose on different occasions. The careful and cautious practitioner should hesitate to proffer one of them in court if there is a danger, advertent or inadvertent, that the hearer will confuse the one for the other. What do we mean? As a factor, the "length of delay" has two distinct functions. There is a procedural function. There is also an ultimately substantive function.

The first of those functions is simply as a "triggering mechanism" for the ultimate four-factored <u>Barker v. Wingo</u> analysis. A party is not entitled to a <u>Barker v. Wingo</u> four-factored analysis simply by asking for one. One must qualify for such an analysis. For that qualifying function, the court typically looks to the "length of delay" in its procedural manifestation. As <u>Barker v. Wingo</u> described that function, 407 U.S. at 530:

> <u>The length of the delay is to some extent a triggering mechanism</u>. Until there is some <u>delay which is presumptively prejudicial</u>, there is no necessity for inquiry into the other factors that go into the balance.

(Emphasis supplied.)

That function is therefore to serve as a "triggering mechanism" for further and fuller analysis. In <u>Doggett v. United States</u>, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), the Supreme Court referred to that gatekeeping role as a part of the "length of delay" factor's "double enquiry," 505 U.S. at 651-52:

> The first of these is actually <u>a double enquiry</u>. Simply <u>to trigger a speedy trial analysis</u>, an accused must allege <u>that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay</u>.

(Emphasis supplied.)

Justice Souter's opinion in <u>Doggett</u>, 505 U.S. at 652 n. 1, stressed the distinctive feature that the phrase "presumptively prejudicial" does not refer to the final four-factored weighing of a speedy trial violation on its ultimate merits but only refers to the purely threshold question of whether a <u>Barker</u> inquiry should even be conducted in the first place:

> We note that, <u>as the term is used in this threshold context, "presumptive prejudice" does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* inquiry</u>.

(Emphasis supplied.)

The Supreme Court of Maryland has been similarly meticulous in recognizing the dual nature of the "length of delay" factor and in carefully distinguishing its gatekeeping function from its weighing function on the ultimate substantive merits. In <u>Glover v. State</u>, 368 Md. 211, 792 A.2d 1160 (2002), the Court was dealing with a length of delay of "slightly more than fourteen months." That was enough to satisfy the threshold function but not enough to influence adversely the ultimate weighing function on the ultimate merits. Judge Battaglia focused on the "double enquiry" nature of the factor, 368 Md. at 222-23:

> A post-indictment, pre-trial <u>delay of sufficient length becomes presumptively prejudicial and thereby triggers scrutiny under the *Barker* factors</u>. Once such a delay is demonstrated courts must balance whether a constitutional violation has occurred: the length of the delay, the reasons for the delay, the defendant's assertion of his speedy trial right, and the presence of actual prejudice to the defendant. Thus, <u>the length of delay is a "double enquiry" as it both triggers constitutional analysis and is a factor in determining whether a defendant's constitutional right to a speedy trial has been violated</u>.

50

(Emphasis supplied.) The opinion stressed that although fourteen months had been adequate as a trigger mechanism, it was not adequate to be a "weighty factor" on the ultimate merits of a speedy trial violation:

> The fourteen-month <u>delay certainly requires constitutional scrutiny</u>. <u>It is not so overwhelming, however, as to potentially override the other factors</u>. <u>The length of delay, in and of itself is not a weighty factor</u>.

368 Md. at 224-25. (Emphasis supplied.)

The holding of that case underscores our observation that in terms of the "length of delay," sufficiency for one purpose is not sufficiency for a very different purpose.

> While <u>the pre-trial incarceration was of constitutional dimensions requiring scrutiny under the *Barker* factors</u>, <u>we do not believe that</u> <u>it was inordinate or unduly oppressive given the factual circumstances of this case</u>.

368 Md. at 229. (Emphasis supplied.)

<u>State v. Kanneh</u>, 403 Md. 678, 944 A.2d. 516 (2008), reconfirmed the duality of the "length of delay's" nature. As Judge Greene wrote for the Court:

> This Court has noted that the first factor <u>the length of the delay, is a "double enquiry"</u> because <u>a delay of sufficient length is first required to trigger a speedy trial analysis</u>, and <u>the length of the delay is then considered as one of the factors within that analysis</u>.

403 Md. at 688. (Emphasis supplied.)

In the weighing process on the ultimate merits of speedy trial compliance, the "length of delay" factor is actually of slight significance. As <u>State v. Kanneh</u> observed, 403 Md. at 689:

> <u>Of the four factors</u> we weigh in determining whether Kanneh's right to a speedy trial has been violated, "<u>the length of delay, in and of itself, is not a weighty factor</u>."

51

(Emphasis supplied.) For that ultimate purpose, it is not "presumptively" anything. *See also* Erbe v. State, 276 Md. 541, 547, 350 A.2d 640 (1976). ("[D]elay is the least conclusive of the four factors identified in Barker."). (Emphasis supplied.) State v. Kanneh, 403 Md. at 689-690, concluded:

> Although the delay of 35 months in this case is certainly sufficient to merit constitutional scrutiny, the length of the delay is the least determinative of the four factors that we consider in analyzing whether Kanneh's right to a speedy trial has been violated.

(Emphasis supplied.)

### Beware The Term: "Presumptively Prejudicial"

In both Barker v. Wingo and Doggett, however, the U.S. Supreme Court spoke of the "length of delay" as satisfying its function as a triggering mechanism if the "length of delay" is "Presumptively Prejudicial." "Ah, there's the rub!"

Beware that descriptive label: "presumptively prejudicial." It is a rogue phrase. Its actual legal significance is mild, but it wields a threat of being linguistically toxic. The very language packs a punch. It is a classic example of "All Bark and No Bite." Wily practitioners covet the persuasive impact of the "Bark" even if the effect of the "Bite" is relatively harmless. The phrase resonates as something dispositively decisive even when it decides nothing more than whether a procedural threshold has been crossed. It can easily be misused as a deceptive trick of the trade and, when the phrase is brandished grandiosely, as it frequently is, should be taken with a large grain of salt.

The linguistic danger, of course, is that the descriptive phrase "presumptively prejudicial" has a potential "Jekyll and Hyde" duality. It is perfectly proper, of course,

52

when referring to the benign triggering of a further and fuller examination of the subject by Dr. Jekyll. It turns completely improper, on the other hand, if referring to the malign inflicting of prejudice on the defense by Mr. Hyde. Albeit in close proximity to each other, the two "length of delay" functions appear in two very different (albeit closely abutting) contexts. The phrase "presumptively prejudicial" that aptly describes "length of delay" in one of those contexts – as a triggering mechanism – must never be lifted out of that purely procedural context and misapplied in the other substantive context – the ultimate four-factored weighing – where it could easily (and frequently does) give a deceptively false impression.

The caselaw itself is not without its share of the blame. The very phrase "presumptively prejudicial" was an unfortunate choice of words – in the place where it is used and for the purpose for which it is used. It was used to describe a particular kind of "prejudice." An immediate problem was that "prejudice" itself not only had two different meanings, but had two different functions within the same tightly confined analysis. One of those meanings was only procedural. The other, however, was substantive. Other words could, and should, have been found to convey that threshold idea. As a trigger mechanism, a relatively modest amount of prejudice is enough to justify at least making a <u>Barker v. Wingo</u> analysis. That relatively modest quantity of delay is enough to justify the use of the adverb "presumptively." It is enough "prejudice" to satisfy the procedural function.

If such a further four-factored analysis is then justified, however, the "length of delay" then takes on a different meaning, a substantive one. It then becomes one of four factors to be weighed in deciding whether on the ultimate merits the constitutional right to

53

a speedy trial has been violated. As one of the least important factors on that question, it therefore is of far slighter consequence than it had as a trigger mechanism. With respect to the second function, simply as one factor in the four-factored weighing process, the "length of delay" may have very little, if any, significance at all. It is not "presumptively" anything in that context, although the adverb "presumptively" strongly suggests otherwise. The term "presumptively prejudicial," therefore, should never be used with reference to that second substantive function.

In speedy trial analysis, moreover, "prejudice" has a slippery double meaning. At the threshold, "prejudice" means simply the modest amount of delay that will at least justify engaging in a further constitutional analysis. It is just enough to <u>raise</u> a question, not enough to <u>resolve</u> it. As a part of that further constitutional analysis, however, "prejudice," particularly as prejudice to the defendant's case, is then one of the four factors to be weighed on the ultimate substantive merits. It is a factor that might resolve the case in favor of a speedy trial violation.

The relatively minimal amount of delay, to wit, the "prejudice," that may raise the issue procedurally will typically be far less than the far more maximal amount of delay, to wit, the "prejudice," needed to resolve the issue of a constitutional violation substantively. The problem, of course, is that both of these widely divergent meanings of "prejudice" appear, virtually cheek by jowl, in the same tightly packed analysis. <u>Raising</u> the issue is one context. <u>Resolving</u> the issue is a very different context. The "prejudice," which is the threshold trigger in the first context is not the same "prejudice" that is the dispositive focus of attention in the second context. To <u>raise</u> the issue is not to <u>resolve</u> the issue.

By referring to both the procedural function, which requires only modest delay, and also the substantive function, which requires far more by way of delay, by the same label, "prejudice," the very choice of words makes it difficult to be precise. The "length of delay" that may be "presumptively prejudicial" in one context is obviously not "presumptively prejudicial" in the other context. But linguistic profusion engenders linguistic confusion. After a given "length of delay" has served its purpose as a triggering mechanism, it seldom, if ever, serves any special purpose beyond that. As a relatively minor factor in <u>Barker v. Wingo</u>'s four-factored weighing process, the "length of delay" in and of itself is frequently, if anything, actually "Presumptively <u>Non</u>-Prejudicial." Beware the term: "presumptively prejudicial." It is slippery.

## Which "Length Of Delay" Are We Talking About?

There is an even more fundamental problem with the "length of delay" in this double-barreled case. The "length of delay" pursuant to the first contention – the analysis of the <u>Hicks</u> Rule and the <u>Curley</u> exceptions – is by no means necessarily the same as is the "length of delay" pursuant to the second contention – the analysis of the appellant's right to constitutional speedy trial. The appellant does not tell us precisely what the "length of delay" is that he is talking about nor does he tell us how even to compute that "length of delay."

For purposes of constitutional speedy trial analysis, our key computation of the "length of delay" begins pursuant to <u>Clark v. State</u>, 97 Md. App. 381, 629 A.2d 1322 (1993). When charges against a defendant are Nol Prossed, as happened in this case, and

new charges are subsequently filed, the speedy trial clock is reset with the filing of the new

charges, <u>unless the State was guilty of acting in bad faith</u> when it filed the Nol Pros. As the

<u>Clark</u> opinion stated, 97 Md. App. at 393-94:

> The instant case presents an appropriate situation in which to apply the *MacDonald* Rule. <u>If the prior termination of charges is done in good faith, we start the speedy trial clock at the second indictment</u>. We therefore hold in the case *sub judice* that <u>the time preceding the second indictment will not be considered in our initial determination as to whether the delay is presumptively prejudicial</u>.
>
> <u>The period from the reindictment was not more than six months, which in most cases would not be considered presumptively prejudicial</u>.

(Emphasis supplied.)

In <u>State v. Henson</u>, 335 Md. 326, 336, 643 A.2d 432 (1994), the Maryland Supreme

Court spoke to the same effect:

> [W]hat the Supreme Court of the United States has said on the subject is binding on this Court. Accordingly, the Rule of *MacDonald* applies to the case *sub judice* – <u>the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges</u>. <u>Thus, where it is shown that the State has acted in good faith, we hold that the period between the good faith termination of a prosecution and the reinstitution of that prosecution</u>, in this case, the indictment on May 8, 1990, <u>will not be considered in the speedy trial analysis</u>.

(Emphasis supplied.)

In <u>Greene v. State</u>, 237 Md. App. 502, 513, 186 A.3d 207 (2018), this Court made

it clear that Maryland was in this regard simply following the teaching of the Supreme

Court of the United States:

> In <u>United States v. MacDonald</u>, 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), the United States Supreme Court held that <u>the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops</u>

charges. <u>Once charges are dismissed, the speedy trial guarantee is no longer applicable</u>.

(Emphasis supplied.) Maryland simply followed suit:

> The Maryland Court of Appeals formally recognized the *MacDonald* good-faith exception in *State v. Henson*, 335 Md. 326, 338, 643 A.2d 432 (1994). In *Henson*, the Maryland Court of Appeals held that <u>the State terminates a prosecution in "good faith" when the State does not intend to circumvent the speedy trial right</u>, and the termination does not have that effect. If those two factors are present, <u>the period preceding the earlier dismissal is not counted in the speedy trial analysis</u>.

237 Md. App. at 513-14. (Emphasis supplied.)

Thus, the pertinent constitutional speedy trial clock in this case began to tick on October 27, 2021, when the appellant was arrested on the reindicted charges against him. That count thus ended with the beginning of his trial on September 26, 2022. The "length of delay" was thus one of eleven months, a relatively modest "length of delay." The appellant, however, using the wrong method of counting, claims that the "length of delay" was one of "approximately two years and five months." There is a big difference between 11 months and 29 months. The State and the appellant are not even on the same page.

With respect to the good faith of the Nol Pros in this case, one of the key express Findings in Judge Atas's written Order of December 17, 2021 was:

> FOUND that <u>the State's Attorney acted in good faith when she entered a nolle prosequi to case # 120174048</u>;

(Emphasis supplied.) In his written Order of December 17, 2021, Judge Atas ruled also, "FOUND that 'where criminal charges are not pursued and identical charges are refiled, <u>the 180-day time period for commencing trial…begins to run anew after the refiling</u>.'"

(Emphasis supplied.)

With respect to that argument by the State as to when the calculation of a new "length of delay" begins following a Nol Pros and reindictment, the appellant does not even respond. Just so long as the Nol Pros was entered in good faith, the only "length of delay" or reason for such delay that concerns us has to be a post-reindictment circumstance, not a pre-reindictment circumstance. That settles the matter in this case. The "length of delay" that the appellant is building his speedy trial argument around does not even exist. The Nol Pros was already ancient history before the new and pertinent "length of delay" in this case even dawned.

**Out Of One Context
And Into Another**

As we now turn our attention to the four <u>Barker v. Wingo</u> substantive factors that enter into the final weighing process in the present case, the first of them is the "length of delay." It is here that we find the appellant guilty, if not of linguistic malfeasance, at least of linguistic non-feasance in taking language or analysis out of a non-pertinent procedural context and misapplying it in a very different but pertinent substantive context. In the appellant's brief, five and one-half pages are dedicated to the entire subject of the constitutional right to a speedy trial. Of that argument, one and one-quarter pages are dedicated to the sub-topic of "length of delay." The five final lines of that sub-argument, in addition to remaining ambiguous about precisely which decision by precisely which judge is being challenged, make it clear that the heart of the appellant's argument points out the caselaw's use of the phrase "presumptively prejudicial" or a close equivalent:

> <u>In the instant case, the length of delay from arrest to the start of trial was approximately two years and five months</u>. Even accounting for the pandemic,

> the delay should be regarded as presumptively prejudicial and must weigh against the State. This was true at the hearing before Judge Atas on December 15, 2021, and it was especially true by the start of trial in September 2022.

(Emphasis supplied.)

The full context of the brief's discussion of the "length of delay" factor as a part of Barker v. Wingo's four-factored analysis consists of a scant eight lines. In those eight lines, the appellant cites five Maryland appellate decisions. From each opinion, the appellant pulls out, and places in parentheses, a word or a phrase used by that opinion to describe the "length of delay" factor. In each of the five cited opinions, however, the court was using the word or the phrase only to describe "length of delay" in its lesser threshold function as a triggering mechanism. The appellant, however, cherry-picked those words and phrases out from that threshold context but then applied them in the very different context of analyzing "length of delay" as a part of the ultimate four-factored weighing process where it clearly did not have the same triggering significance that it enjoyed in its threshold context as a trigger mechanism.

The argument that the appellant was there presenting, moreover, had absolutely nothing to do with "length of delay" as a triggering mechanism. The appellant had already won that battle and had moved on into the Barker v. Wingo ultimate balancing itself. The words and phrases cited by the appellant could no longer serve any conceivable purpose in that threshold capacity for that threshold had already been crossed. That was no longer in issue. Why, therefore, was the appellant touting the "length of delay" in this case as an adequate trigger mechanism? The appellant obviously wished to transfer those

59

descriptions into a new and different context. The eight lines from the appellant's argument were:

> [A] review of case law provides general guidance. *Compare* <u>Divver</u>, 356 Md. 379 (regarding a six-month and a half month delay "**inordinate**") *with* <u>Gee</u>, 298 Md. at 579 (regarding a six-month delay as "not **presumptively prejudicial**"; *see also* <u>Ruben</u>, 127 Md. App. at 440 (deeming eleven-month delay to be "**of constitutional dimension**"); <u>Dorsey v. State</u>, 34 Md. App. 525, 533 (1977) (concluding that eleven-month delay was **presumptively prejudicial**.) *See also* <u>Carter v. State</u>, 77 Md. App. 462, 466 (1988) (finding that in a simple credit card misuse case, a delay of nearly eight months was **presumptively prejudicial**).

(Emphasis supplied.) In the appellant's brief we were never told in what precise contexts those adjectives had originally been found. We must look for ourselves.

In <u>Divver v. State</u>, 356 Md. 379, 739 A.2d 71 (1999), our Supreme Court's conclusion that "the delay is of uniquely inordinate length," 356 Md. at 390, concluded an extended discussion of "length of delay" simply as a triggering mechanism:

> <u>Thus the one year and fourteen day delay in <u>Epps</u> was, on its facts, sufficiently inordinate to constitute a "triggering mechanism" to engage in the sensitive balancing process. [A]nything over a one-year, 14-day interval between arrest and trial is "presumptively prejudicial" requiring us to engage in the balancing procedure outlined in Barker.</u>

356 Md. at 389. (Emphasis supplied.) That was definitively the context of the threshold triggering mechanism. It was not the context in which the appellant was then seeking to use it. Notwithstanding its threshold status as "inordinate" and "presumptively prejudicial," the delay of one year and sixteen days did not amount to a substantive speedy trial violation.

In <u>State v. Gee</u>, 298 Md. 565, 471 A.2d 712 (1984), the adjectives and adjectival phrases "inordinate," "of constitutional dimension," and "presumptively prejudicial" were all used simply in analyzing the "length of delay" in its threshold context as a

triggering mechanism. That was not the context in which the appellant was seeking to use them. In that case, the delay was not sufficient even to necessitate Barker v. Wingo's four-factored balancing. Judge Orth wrote for our Supreme Court:

> The interval from the filing of the detainer on 9 September 1981 to the trial on 16 February 1982 was less than six months. In the circumstances of this case, a delay of that length is clearly not inordinate. We are not aware of an opinion of the Supreme Court of the United States or of the appellate courts of this State which holds that a delay of six month is of constitutional dimension. Since the delay in bringing Gee to trial was not presumptively prejudicial, there is no necessity for inquiry into the other factors which go into the balance.

298 Md. at 578-79. (Emphasis supplied.)

In State v. Ruben, 127 Md. App. 430, 732 A.2d 1004 (1999), the delay of "nearly 11 months" was just barely enough to trigger the Barker v. Wingo weighing process:

> In this case, the delay of nearly 11 months from arrest to trial was of constitutional dimension albeit barely so. We therefore analyze the delay in bringing appellee to trial and its consequences under the Barker factors.

127 Md. App. at 440-41. (Emphasis supplied.) The "length of delay" in State v. Ruben and the more carefully computed "length of delay" in the case now before us were both delays of eleven months. In State v. Ruben, as in the case before us, the delay was enough to activate the trigger mechanism for a Barker v. Wingo analysis. Notwithstanding its threshold status "of constitutional dimension," the delay in State v. Ruben of merely eleven months did not amount to a constitutional speedy trial violation. Neither does it in this case.

In Dorsey v. State, 34 Md. App. 525, 368 A.2d 1036 (1977), this Court held that a delay of "almost 11 months" was "sufficiently inordinate" to activate the "triggering mechanism."

> While there is no precise formula for computing an unconstitutional delay, <u>we find the almost 11-month period,</u> in the circumstances of this relatively uncomplicated drug case, between Dorsey's arrest and trial <u>to be sufficiently inordinate to constitute a "triggering mechanism" to prompt inquiring into the other factors which go into the balance</u>.

34 Md. App. at 533. (Emphasis supplied.) <u>Dorsey v. State</u> shared with the case before us a "length of delay" of eleven months. Notwithstanding its threshold status as "presumptively prejudicial," the delay of almost eleven months in <u>Dorsey v. State</u> did not amount to a speedy trial violation. Neither does it in this case.

In <u>Carter v. State</u>, 77 Md. App. 462, 550 A.2d 972 (1988), this Court held that a delay of seven months and 25 days was "presumptively prejudicial." It was, therefore, enough to trigger the balancing test:

> We hold that under the circumstances of this case <u>a seven-month, twenty-five day delay</u> between appellant's arrest and the hearing on April 19, 1988 <u>is presumptively prejudicial</u>. Under these circumstances, <u>such a delay triggers the Barker v. Wingo balancing test</u>.

77 Md. App. at 466. (Emphasis supplied.) Notwithstanding its threshold status as being "presumptively prejudicial," the delay in this case did not amount to a speedy trial violation.

Those five unadorned and unexplained citations to three adjectives and adjectival phrases is the sum total of the appellant's argument with respect to the "length of delay" factor. All five of these citations were beyond any peradventure of a doubt taken exclusively from the context of "length of delay" as a threshold trigger mechanism; a subject which is not even in issue in any way in the present case.

62

All five of those linguistically potent phrases were then lifted from the relatively innocuous contexts in which they had been found and were then misapplied in this case into the very different context of the weighing process to decide the ultimate constitutional merits. If not carefully confined to the relatively innocuous threshold context, the very phrase "presumptively prejudicial" could easily be taken to imply that if nothing else were shown, that length of delay in and of itself would raise a presumption that the defendant had been unconstitutionally prejudiced. That is the function of the adverb "presumptively." That, of course, is clearly not the case, but the linguistic danger should be evident. This was a classic example of taking a vividly descriptive adjective out of an innocuous context and then transplanting it into a far different and far more dynamic context.

With respect to the ultimate four-factored Barker v. Wingo weighing process, the appellant's argument about the "length of delay" factor thus yields him nothing. He never even described "length of delay" as a factor in the four-factored weighing process of Barker v. Wingo. There is not one word of discussion or of argument with respect to "length of delay" as a substantive factor in the four-factored weighing process. The appellant has done nothing except to cite the disembodied adjective or adjectival phrase used to describe a "length of delay" in its very different context as a triggering mechanism. That won't do it. He did it, moreover, no less than five times. Five times zero, however, is still zero.

### Reason For Delay

With respect to the second of the four factors, the reason for the delay, the Barker v. Wingo opinion, 407 U.S. at 531, was very clear:

> Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

(Emphasis supplied.)

In his appellate brief the appellant devotes one-half of a single page to the subject of "reason for the delay." Most of that half-page discussion, moreover, is nothing more than a rehash of what Barker v. Wingo said by way of its general description. The full discussion of "reason for delay" in the speedy trial section of the appellant's brief consists of a spare three lines:

> On October 5, 2021, as argued in Argument I, the State *nol prossed* the charges to impermissibly circumvent the denial of its postponement request. Under these circumstances, the reasons for delay should weigh heavily against the State.

(Emphasis supplied.)

That is cursory in the extreme. It was also baldly conclusory. The fundamental flaw in so summary an analysis of the "reasons for delay" factor in this case is that it does not tell us anything. It simply asserts that "the reason for delay should weigh heavily against the State." Tell us why.

The sole discussion of any reason for delay is the appellant's bold assertion that the State on October 5, 2021 Nol Prossed the original charges "to impermissibly circumvent the denial of its postponement request." (Emphasis supplied.) In his written Order of

December 17, 2021, on the other hand, Judge Atas, after conducting a full evidentiary hearing expressly found that "the State's Attorney acted in good faith when she entered a nolle prosequi" in the case. This is the only "reason for delay" argument mentioned in the entire appellant's brief and the only "reason for delay" ever mentioned in the appellant's discussion of <u>Barker v. Wingo</u>'s four-factored analysis.

Technically, moreover, this single argument about a reason for a delay does not even count as a legitimate argument. If the "length of delay" for constitutional speedy trial purpose does not even start to compute until after the reindictment of October 27, 2021, the Nol Pros of October 5, 2021, was not even within the relevant "length of delay" and cannot register as a reason for the subsequent delay.

Since this is the exclusive argument about a reason for delay made by the appellant, it is not even necessary for us to refer to the Covid-19 pandemic as a quintessentially neutral phenomenon. That is a topic unto itself.

### Assertion Of A Request For Speedy Trial

With respect to <u>Barker v. Wingo</u>'s third factor, the defendant's assertion of his request for a speedy trial, the <u>Barker</u> opinion, 407 U.S. at 531-32, explains:

> <u>The more serious the deprivation, the more likely a defendant is to complain</u>. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that <u>failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial</u>.

(Emphasis supplied.)

With respect to that third factor that enters into the four-factored weighing process, the appellant in his appellate brief offers us painfully little and even that little is painfully summary. In his brief, a total of five lines are devoted to the third factor:

> Judge Atas recognized that Mr. Griffin had repeatedly asserted his speedy trial rights, and on September 26, 2022, Judge Bryant commented that "there's no question the Defendant asserted his right to a speedy trial at every turn." There is no dispute Mr. Griffin's frequent invocation of his speedy trial rights weighs heavily in Appellant's favor.

(Emphasis supplied.)

That is also cursory. It is also boldly conclusory. The fundamental flaw in so summary an analysis of the "assertion of right" factor is that it does not tell us anything. When and where – and how – did the appellant request a speedy trial? And what, moreover, was the exact nature of the requests? The appellant does not suggest how this factor interacts with the other Barker v. Wingo factors. He simply asserts as a conclusion that it "weighs heavily in appellant's favor." Tell us why.

The appellant makes no mention of any particular assertion of his right to a speedy trial. He peculiarly makes no mention of precisely when such assertions were made. As we specifically discussed with respect to the "reason for delay" factor, any assertion of a speedy trial request prior to October 5, 2021, the date when the Nol Pros of the original charges was entered, would be meaningless for the present analysis. Our concern is exclusively with the new charges, with the "length of delay" which only began to be measured as of the filing of new charges on October 27, 2021. We are aware of no motions or litigation filed by the appellant with respect to the prompt resolution of the new charges.

66

Our concern is with the constitutionally guaranteed right to a speedy trial of the new charges, not to the speedy trial of the old charges which no longer exist.

To the extent to which any discussion of a speedy trial even arose, moreover, prior to December 15, 2021, the day on which the Sixth Amendment was belatedly inserted into this case's trial agenda, such earlier discussion was exclusively in the context of compliance with the Hicks Rule. It could not involve an assertion of a constitutional right, an issue that was not yet even before the court. To the extent to which any ostensible findings were made with respect to the appellant's assertions of his right to a speedy trial, such assertions had necessarily been with respect to his statutory speedy trial right pursuant to Hicks and not with respect to any constitutional speedy trial right.

With respect to any speedy trial assertion, old or new, moreover, it is vitally important to know whether a defendant is genuinely and affirmatively actually requesting a speedy trial or is opportunistically seeking to dismiss charges because of the denial of a speedy trial. *See* Gilbert and Moylan, Maryland Criminal Law: Practice and Procedure, Sect. 42.3 at 527 (Michie 1983): "The request, 'Try me today!' is a far cry from that other request, 'Try me never, because you did not try me yesterday!'" Did the appellant really want a trial or did he not want a trial? As we assess an individual, it does make a difference. The tone and the nature of a defendant's request are important for a court to know. Is it a genuinely plaintive plea to "Get these charges against me resolved" or is it a procedural ploy simply to dismiss the charges? As Barker v. Wingo, 407 U.S. at 529, described this reading of emotional purpose:

It would also allow a court to weigh the frequency and force of the objections as opposed to attaching significant weight to a purely pro forma objection.

(Emphasis supplied.) The assertion of the right should involve more than merely a pro forma objection. The trial should be more than a chess match between two skilled adversaries.

## Prejudice To The Defendant

Of the four Barker v. Wingo factors, by far the most important is prejudice to the defendant. In measuring that prejudice, the most significant sub-factor is prejudice to the defense of the case. The Supreme Court, 407 U.S. at 532, explained:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

(Emphasis supplied.)

In Glover v. State, 368 Md. at 230, the Maryland Supreme Court spoke to the same effect:

> Of the three elements, the most serious is the potential that a delay will impair the ability to present an adequate defense and thus skew the fairness of the entire adversarial system. A delay in trial can result in the impairment of one's defense due to both tangible factors, such as the unavailability of witnesses or loss or destruction of records, and intangible factors, including fading memories about the incident in question and a decrease in the likelihood that exculpatory witnesses can be found.

(Emphasis supplied.)

It is hard to know how to respond to any argument the appellant makes with respect to "prejudice" to the appellant or to his defense. It is hard to find anything the appellant has argued not with respect to defendants and defenses generally but with explicit reference to this defendant and to his defense. Before turning to prejudice to the appellant's defense, the appellant has not suggested any other way in which his pre-trial detention has actually prejudiced him personally. Did he lose a marriage? Did he lose a job? Did he lose wages? Did he lose an educational opportunity? Either before Judge Atas or before Judge Bryant or before this Court, the appellant has asserted nothing that would amount to personal prejudice. He simply wants us to presume it.

With respect to prejudice to the defense of his case, the appellant is equally completely silent. There is no suggestion that any witness died or otherwise went missing. There is no suggestion that anyone's memory, including the appellant's, had failed. There is no suggestion that any document or other physical evidence had been lost or destroyed. On this vitally important factor of prejudice, the appellant has not offered a hint or a murmur as to any prejudice he has suffered. He apparently again wants us simply to "presume prejudice." That is why, of course, he relies on the phrase "presumptively prejudicial."

The appellant's argument does take one interesting turn. He offers some very general language from the U.S. Supreme Court cases of <u>Barker v. Wingo</u> and from <u>Doggett v. United States</u>, <u>supra</u>, telling us that sometimes the circumstances are such that it is not always possible for a defendant to be able to prove or even to identify the effects of delay that are prejudicial. The appellant is, in effect, offering snippets from caselaw to excuse his

failure to offer any evidence of prejudice. They are simply excuses for not producing any evidence. The citations from the caselaw, however, do more than that. In an effort to forgive the absence of any evidence of prejudice, the citations serve to underscore the stark fact that the appellant has failed to offer the tiniest shred of any evidence of prejudice.

Barker v. Wingo itself, moreover, was quick to point out that the lack of any evidence, pro or con, is not a neutral factor. In Barker there was a "length of delay" of approximately five years and much of that delay was attributable to the State. On balance, however, the Supreme Court held that this had not been a violation of the constitutional right to a speedy trial. One of two counterbalancing factors that outweighed the other factors was the absolute lack of any evidence of prejudice. It was not the State's affirmative evidence of non-prejudice. It was the complete failure of the defendant to produce any evidence of actual prejudice:

> Two counterbalancing factors, however, outweigh these deficiencies. The first is that prejudice was minimal. Of course, Barker was prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety. Moreover, although he was released on bond for most of the period, he did spend 10 months in jail before trial. But there is no claim that any of Barker's witnesses died or otherwise became unavailable owing to the delay. The trial transcript indicates only two very minor lapses of memory – one on the part of a prosecution witness – which were in no way significant to the outcome.

407 U.S. at 534. (Emphasis supplied.) The appellant suffers the same plight in this case.

The absence of any evidence of prejudice was a big factor in Judge Atas's ruling from the bench on December 15, 2021. Judge Atas first recognized that there were two very different speedy trial issues before him for his decision:

I really see there's two issues that the Defense has raised, both a Constitutional speedy trial concern as well as a statutory Maryland Rule concern as to the Hicks right.

(Emphasis supplied.)

Of those two issues, the legally more nuanced of the two and the one more vigorously advanced by the appellant was the statutory right to a speedy trial pursuant to the Hicks Rule and the Curley exception. Judge Atas delayed ruling on that until he could do so in his written Order of December 17, 2021. On the obviously more incidental constitutional speedy trial argument, however, he was content to rule from the bench:

> As it related to the Hicks concerns, I have a lot to consider here. And my intention is to consider this and issue a written order on this. I intend to do that soon, within the next week or two, but I don't think it's necessary to set another hearing for that[.]

(Emphasis supplied.)

As to the merits of the constitutional speedy trial claim, the absence of any evidence of prejudice was clearly a major factor in Judge Atas's ruling that this had not been a violation of the appellant's right to a speedy trial:

> Prejudice to the Defendant. You know, there's been a lengthy period of incarceration here. All right. But that's the only aspect that I see as possibly prejudicial to the defendant. But I don't see how this delay has really prejudiced his ability to defend himself in this case. You know, none of the witnesses, you know, sometimes we're concerned about if a witness is no longer available at all, or, you know, just evidence sort of dissipates over time, those issues aren't presenting themselves here. So, again, it's a balancing factor, a balancing test of these factors. As of today's date, I can say that the defendant's speedy trial rights have not been violated as it related to the Constitutional argument.

(Emphasis supplied.)

71

With respect to Judge Bryant's later ruling of September 26, 2022, on the constitutional speedy trial claim, it was very summary. She did rule with respect to a much shorter "length of delay" than that claimed by the appellant that a good-faith Nol Pros followed by a reindictment did dramatically reset the clock, "[C]onsidering that the dismissal and reindictment reset the time clock in this case…" (Emphasis supplied.) When it comes to the merits of the constitutional speedy trial claim, the failure of the appellant to offer any proof of prejudice was a big part of her ultimate ruling:

> [A]s to the issue of prejudice, the Court agrees that Defendant did not show any particular prejudice. Yes, incarceration is difficult when one is waiting for a trial and, certainly, post-trial. Yes, Covid was a problem in jail, but it was an equal problem outside of jail as indicated by the millions of people in this nation and across the world who died.

(Emphasis supplied.)

## The Barker v. Wingo Four-Factored Analysis

What then is the end result of Barker v. Wingo's four-factored weighing process in this case? As a result of Clark v. State, supra; State v. Henson, supra; and Greene v. State, supra, and the required resetting of the speedy trial clock to begin as of October 27, 2021, we begin with a "length of delay" of just eleven months, far from the two years and five months posited by the appellant. Eleven months might be questionable, indeed borderline, even as a triggering mechanism for the four-factored weighing analysis, but the appellant has already received the benefit of any uncertainty in that regard. We are now engaged in that four-factored analysis. So, substantively we begin with a "length of delay" of eleven months.

We turn to the "reason for delay." The appellant has advanced a single reason that he claims can be attributed to the State. The appellant cites the Nol Pros of October 5, 2021 and seeks to blame it on the State because the State was attempting "to <u>impermissibly circumvent</u> the denial of its postponement request." Such an alleged impropriety by the State, however, was completely belied by Judge Atas's careful finding of December 17, 2021 that "the State's Attorney acted in good faith when she entered a nolle prosequi." The appellant has not in any respect challenged Judge Atas's finding in that regard. The appellant has simply ignored Judge Atas's finding. A good faith Nol Pros was not an "impermissible circumvention." In the "reasons for delay" category, the appellant is left with nothing.[5]

The third <u>Barker v. Wingo</u> factor is the appellant's assertion of his right to a speedy trial. With respect to how many times the appellant asserted his right and with respect to the manner of his assertion, the record before us is in very much of a muddle. The prime culprit is that in almost all, if not all, of the arguments and motions on this issue, all parties largely ignored the fact that the speedy trial clock in this case was reset as of October 27, 2021 and that only events, including speedy trial requests and demands, occurring after that resetting of the clock could have any bearing on this issue now before us. We are left with only stray clues.

---

[5]    In terms of the appellant's "reason for delay" claim being an empty one, this does not even take into account the stark reality of the new calendar once the speedy trial clock had been reset to October 27, 2021. A Nol Pros on October 5, 2021 could have no effect on a "length of delay" that did not even begin to run until October 27, 2021.

In his appellate brief, we are told that "defense counsel argued that he reasserted Mr. Griffin's speedy trial right at least six times." That's a start. From the appellant's history of various trial events, we can dig at several additional clues. On June 22, 2020, the appellant filed a Motion to Dismiss in District Court because he had not received a preliminary hearing within 30 days. On July 2, 2020, about a week after the filing of the indictment, the appellant filed his "entry of appearance, speedy trial demand, discovery request, and other documents." This appears to have been a pro-forma filing. On June 14, 2021, the appellant "reasserted his speedy trial rights." At a Zoom hearing on October 5, 2021, prior to the entry of the Nol Pros, "Defense counsel again reasserted Mr. Griffin's speedy trial rights."

Unless we are prepared to overrule Clark v. State, supra, it is clear that these ostensible examples of a speedy trial assertion all happened before the resetting of the speedy trial clock as of October 27, 2021, and may not be considered in the Barker v. Wingo weighing analysis now before us.

At least one assertion, on the other hand, is properly before us. Just before trial on September 26, 2022, defense counsel renewed his motion to dismiss based on a violation of constitutional speedy trial rights. Was there, somewhere within this massive case record, at least one other instance of a request for a speedy trial that fits within our pertinent time period for present consideration? We do not know. In all of this case record, moreover, the irrelevant as well as the relevant, the entries appear to have been not so much actual requests for a speedy trial as motions to dismiss all charges because of the lack of a speedy trial. As we have already noted, there is at least a subtle difference between the two. Did

74

the appellant truly want to be tried? With respect to an assertion of the right to a speedy trial, it would appear that there was at least one, and possibly two, that could have entered into the four-factored weighing process in this case.

The fourth <u>Barker v. Wingo</u> factor is prejudice, either to the defendant or to his case. As we have fully discussed, the appellant offered absolutely nothing in those regards.

What then is our bottom line? It is a "length of delay" of eleven months. Then as a "reason for delay" attributable to the State, the appellant has proffered absolutely nothing that holds up. As for an "assertion of the right," the appellant has proffered one, or possibly two, pro-forma motions for a dismissal on speedy trial grounds. As for "prejudice to the defense," the appellant has not so much as suggested any.

## A Gaping Difference

This <u>Barker v. Wingo</u> sum total is quantitatively as devoid of ultimate merit as such a sum total could ever be. We affirm the denial, by either judge, of the appellant's motion to dismiss all charges on the basis of a constitutional speedy trial motion.

No one could seriously tell us that such a bereft sum total could ever amount to a constitutional denial of the right to a speedy trial. Yet the appellant tells us, with a five-fold invocation of appellate scripture, that the "length of delay" in this case was presumptively prejudicial.[6] How do we account for so gaping a difference in contrasting characterizations of essentially nothing?

## A Linguistic Trojan Horse

---

[6]  "Yet Brutus tells us that Caesar was ambitious."

How bad is it to take something out of context? Even if a sin, it resonates as a relatively venial sin. Can the admonition against taking the term "presumptively prejudicial" out of context be restated in more meaningful terms? Initially it would help to forego such general terms as "out of one context" and "into another" and to substitute more precise terminology such as "context of origin" and "context of subsequent use." We are dealing with a communicative lapse more serious than simply jumping from one cubbyhole into another and more precision in terminology is called for. Our semantic risk of confusing contexts could be drastically reduced if our vocabulary encouraged us to distinguish one context from another.

In its context of origin, "presumptively prejudicial" was simply the procedural by-product of a one-factored analysis that was aimed at justifying a further examination. The Trojan Horse of "presumptively prejudicial" was thereby welcomed into the citadel of the context of origin. The term had gained entrance into the analysis.

In the context of subsequent use, by massive contrast, "presumptively prejudicial," after its entry into the case, was then used in an effort to contribute to the substantive by-product of a four-factored analysis that might yield an ultimately dispositive constitutional violation. The Greeks were thus out of the Trojan Horse and running boldly abroad. So too was the term "presumptively prejudicial." It was loose and was used loosely.

A description of one procedural aspect of a thing is not a substantive description of the entire thing. As our analysis of the four-factored weighing process has shown, the ostensible description by the caselaw of the "length of delay" in this case as "presumptively prejudicial" was virtually the only thing that the appellant had going for him to make out

his case for a constitutional violation. That was no merely venial or trivial substitution from one context to another. It was a misstep, moreover, made possible by the very malleability of the term "presumptively prejudicial." The presumption of prejudice that merely <u>raised</u> the issue in the context of origin became a presumption of prejudice that was offered to <u>resolve</u> the ultimate substantive issue in the context of final destination. Such a switch of function is more than trivial.

## A Narrow Definition

The phrase "presumptively prejudicial" accurately describes a given "length of delay" where that "length of delay" is performing one highly particularized function. It does not describe that "length of delay," however, at all times and when performing other and different functions. It is not therefore a constant definition that can be casually deployed wherever desired. It is a highly particularized definition that can be employed only on a highly particularized occasion. On other occasions, it should not be used.

## The Linguistic Sleight-Of-Hand
## Inherent In The Term "Presumptively Prejudicial"

The claim of ultimate prejudice to the appellant and to his defense caused by the "length of delay" in this case was utterly bereft of merit. What then has given the claim this patina of false vitality? On the ultimate merits, the paltry and unsupported "length of delay" could not even pretend to have been prejudicial. It clearly was not actually prejudicial. Neither, therefore, was it "presumptively prejudicial." Direct quotations from five appellate opinions, nonetheless, made it appear to be so. As if we were watching a shell game, the meaning of the word "prejudice" shifted from procedural prejudice to

substantive prejudice right under our eyes. It is as if when a fast-talking croupier lifts the shell off of the term "prejudice" at the end of his third and final paragraph, we ask if it is the same term "prejudice" that we saw him place under a shell early in his first paragraph? Of course not. The context had shifted from a procedural one to a substantive one, from a context of origin to a context of subsequent use, faster than the eye could see.

## The Problem

A self-evident source of confusion is that a given "length of delay" may well be probably prejudicial in its procedural function but will not be probably prejudicial in its substantive function. To describe a given "length of delay" therefore as "presumptively prejudicial" is appropriate in that first context but not appropriate in that second context. The phrase, however, can slide very easily from the context of origin into the context of subsequent use. An initially accurate description would thereby have become a diametrically inaccurate description. A "length of delay" which had truly been "presumptively prejudicial" in its context of origin would have become in the context of subsequent use a "length of delay" that was actually "presumptively non-prejudicial." How do we eliminate such a self-contradicting blur of language?

## The Solution

At the very outset of our consideration of this second contention, we suggested that our consideration of the constitutional speedy trial claim might have unintended value as a teaching tool. The subject of the resultant lesson has been to be wary of the term "presumptively prejudicial." Initially the term had (and still has) legitimate value, albeit within a limited and tightly particularized context. Overriding that initial value, however,

is the clear danger that reliance on the term might, advertently or inadvertently, spill over into other and possibly vulnerable contexts beyond those originally particularized limits, as it did in this case. In response to our earlier suggestion that the contention might serve as a teaching tool, we now posit the self-evident lesson: **Eschew all use of and eschew all reliance upon the rogue term "presumptively prejudicial."** Its risk of being misunderstood outweighs its communicative utility.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**